Christobal **ROSARIO**

v.

**AMERICAN EXPORT–ISBRANDTSEN
LINES, INC.**

v.

**UNITED STATES of America.**

**Civ. A. No. 71–768.**

United States District Court,
E. D. Pennsylvania.

Memorandum and Order July 25, 1974.

Findings and Conclusions April 2, 1975.

Robert C. Daniels, Philadelphia, Pa.,
for plaintiff.

**1194**

Timothy J. Mahoney, Philadelphia, Pa., for American Export.

Richard Meltzer, Asst. U. S. Atty., Philadelphia, Pa., for U. S. A.

## MEMORANDUM AND ORDER

*NEWCOMER, District Judge.*

On March 31, 1971, plaintiff, an injured seaman, instituted this action against the defendant American Export-Isbrandtsen Line, Inc. under the Jones Act, 46 U.S.C. § 688. Defendant filed its answer on August 12, 1971. Thereafter, on April 27, 1972, the defendant joined the United States of America as a third-party defendant under Rule 14 (c) of the Fed.R.Civ.P. for failure to render adequate medical treatment and care to plaintiff pursuant to 42 U.S.C. § 249(a)(1). We have jurisdiction of this claim under the Federal Tort Claims Act, 28 U.S.C. § 1346. The government answered the third party complaint on August 22, 1972. On April 3, 1974, the plaintiff pursuant to 42 U.S.C. § 249 (a)(1). The third party defendant, United States, now moves to dismiss plaintiff's complaint and cross-claim on the grounds that no administrative claim has been presented to the appropriate government agency as required by 28 U.S.C. § 2675(a) and that the statute of limitations has run on plaintiff's tort action.

 First the Federal Rules of Civil Procedure do allow a plaintiff to file a claim against a third party defendant which arises out of the transaction or occurrence that is the subject matter of the plaintiff's claim against the defendant and 3rd party plaintiff. However, plaintiff may not join a party as a 3rd party in order to assert a claim against that 3rd party except as provided by Rules 14(b) and 14(c). Where plaintiff asserts an admiralty or maritime claim within the meaning of Rule 9(h) the defendant or plaintiff may bring in a 3rd party defendant who may be wholly or partly liable either to the plaintiff or to the 3rd party plaintiff if the claim arises out of the same transaction. See Fed.R.Civ.P. 14(c). If plaintiff or defendant brings in a 3rd party defendant under Rule 14(c) and the defendant as 3rd party plaintiff demands judgment against the 3rd party defendant in favor of the plaintiff, the 3rd party defendant shall make his defenses to the claim of plaintiff and defendant as third party plaintiff in the manner provided by Rule 12 and the action shall proceed as if the plaintiff had commenced it against the 3rd party defendant as well as the 3rd party plaintiff. Because the instant suit involves an admiralty claim and a maritime claim, the nature of the claim asserted by the plaintiff against 3rd party defendant United States is controlled by Rule 14(c).

As indicated above, if the defendant as 3rd party plaintiff demands judgment against the 3rd party defendant in favor of the plaintiff then the action would proceed as if the plaintiff had commenced it against the 3rd party defendant as well as the 3rd party plaintiff. This was also true under the old Admiralty Rule 56. See Moore's Fed. Practice § 14.20 (Cum.Supp.1973). This could mean that in certain situations, where a claim is asserted against the United States, the plaintiff would be required to present the claim to the appropriate agency pursuant to 28 U.S.C. § 2675(a) prior to asserting such claim in federal court because independent jurisdictional grounds would probably be necessary. Fortunately, we are not required to answer that question because in the instant case, the defendant and 3rd party plaintiff did not demand judgment in favor of plaintiff but rather demanded judgment in favor of itself. Consequently, the government must be treated as a true 3rd party defendant for all purposes.

 We must next decide whether or not plaintiff's claim must nevertheless have been presented to the appropriate federal agency prior to its assertion herein. Before attempting to answer

the question, we must recognize first that the claim could be presented to the proper agency at this time because it is not clear that the statute of limitations of two years has run on the claim under applicable federal law. See 28 U.S.C. § 2401 and Tyminski v. United States, 481 F.2d 257 (3rd Cir. 1973). There is nothing in the record at this point to indicate when plaintiff discovered or should have discovered the acts of malpractice set forth in plaintiff's claim filed April 3, 1974, so that we cannot determine at this point whether or not the two years has run. Also, it is important to note that the defendant ship owner brought the government in under 14(c) and not the plaintiff.

Conceptually, the claim asserted by plaintiff against the government can be said to be correctly the claim herein as being a third party complaint by plaintiff against third party defendant which is permitted by Rule 14(c) in which case there would be no requirement that the claim be presented to the appropriate federal agency pursuant to 28 U.S.C. § 2675(a). The last sentence of section 2675(a) reads as follows:

(a) . . . . The provisions of this subsection shall not apply to such claims as may be asserted under the Federal Rules of Civil Procedure by third party complaint, crossclaim or counterclaim.

Because the question of whether or not a plaintiff may sue a 3rd party defendant in any action is dealt with under Rule 14 which is headed "Third Party Practice," we could easily dismiss the government's contention on that basis alone. This would mean that no presentation of the claim would be necessary under the statute and therefore independent jurisdictional grounds would exist under the Tort Claims Act.

A second argument could be made that the claim is correctly before us by way of ancillary jurisdiction even though we find that the claim should have been presented to the agency prior to the assertion of the claim herein.

This would mean that no independent jurisdictional grounds would be necessary for plaintiff to assert a claim against a third party defendant because the section 2675(a) administrative claim requirement is jurisdictional. However, the view that such a claim does not require independent jurisdictional grounds is not the majority view and is not the view taken in this Circuit. See Pearce v. Pennsylvania Railroad Company, 162 F.2d 524 (3rd Cir. 1974). We therefore decline to accept jurisdiction of the claim on the basis of ancillary jurisdiction despite the fact that good arguments exist for our accepting the claim by way of ancillary jurisdiction.

We believe that the claim is properly before us because it is in the nature of a 3rd party claim as set forth in Rule 14 of the Fed.R.Civ.P. The United States is properly in the case and it would serve no good purpose at this point to require plaintiff to present his claim to the appropriate agency because oddly enough both the plaintiff's claim and the claim of the 3rd party plaintiff are in essence identical claims of medical malpractice arising out of the same treatment situation. We feel this view is sound in spite of the fact that plaintiff could not have joined the government as an additional defendant under the case law interpreting that portion of 28 U.S.C. § 2675(a). If that statute excludes third party complaints, cross-claims and counterclaims it should exclude this claim regardless of the label placed on it under the Rules.

The difference to us exists where the United States is not a party as opposed to the situation which we have here where the United States has already been made a proper party and the claim is asserted after proper joinder. Thus we are of the opinion that the plaintiff could not bring the government in as a third party defendant under 14(c) and then assert a claim against the government without first seeking relief from the appropriate agency. This situation can only exist under 14(c) because of the

way that Rule permits the plaintiff to bring in a third party defendant.

Because we view the present claim as a third party claim brought under Fed. R.Civ.P. 14, and because there is presently nothing in the record to indicate when plaintiff's cause of action accrued we will deny the government's motion to dismiss at this time. However, we do not foreclose the possibility that the government may at some time in the future establish when plaintiff discovered or should have discovered the acts of malpractice complained of and would reconsider the government's contention that the statute has run at that time.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

Plaintiff, a seaman, originally instituted this suit against American Isbrandtsen Lines, Inc., for injuries suffered allegedly because of negligently caused and unseaworthy conditions aboard his vessel. After the defendant brought a third-party action against the United States for alleged negligent examination and treatment of plaintiff by the United States Public Health Service and its agents subsequent to plaintiff's injury aboard the S.S. Export Champion, plaintiff himself filed a claim for malpractice against the United States.

By order of May 21, 1974, we granted as unopposed the government's motion to dismiss plaintiff's complaint and claim against government. Upon motion of plaintiff, we struck our order dismissing plaintiff's claim, and gave plaintiff ten days to answer the government's motion.

By opinion and order of July 24, 1974, we denied the government's motion to dismiss, in which the government argued that plaintiff's claim against the government was barred because plaintiff had filed no administrative claim with the appropriate government agency and that the statute of limitations had run on plaintiff's tort action against the government. In this opinion and order, however, we left open the government's right to renew its statute of limitations argument, in which the key issue was the point at which plaintiff first had or reasonably should have had notice of the alleged malpractice by the United States Public Health Service and its agents.

Similarly, by order of December 3, 1974, we denied a subsequent motion by the government to dismiss plaintiff's claim against the government because the statute of limitations had run, but again without prejudice to the renewal of such motion at a later point.

When plaintiff settled his claim against American Isbrandtsen Lines, Inc., plaintiff then proceeded to trial against the government non-jury, in accordance with the Federal Tort Claims Act, 28 U.S.C. § 1346 (1962), on December 6, 1974. On the basis of the testimony and evidence introduced at such trial, we have reached the findings of fact and conclusions of law set forth below.

## FINDINGS OF FACT

1. Plaintiff, Christobal Rosario, was born on July 5, 1925, in New York City, New York, is currently forty-nine (49) years of age.

2. Plaintiff's education extended to and included completion of the eighth grade. (N.T. 5)

3. Plaintiff began shipping as a merchant seaman at the age of seventeen (17). (N.T. 6)

4. Plaintiff served in the United States Army in World War Two. During such service, he had no medical problems, nor was he hospitalized at any time, and had no medical disability at the time of discharge. (N.T. 6)

5. Since the age of seventeen (17), except for his military service, plaintiff has derived his income solely from his employment as a merchant seaman. (N. T. 7)

6. From August 14, 1968, until August 18, 1970, plaintiff's sole employment consisted of his position as a bo-

sun, also known as a "boatswain", aboard the S.S. Export Champion, in the employ of American Export-Isbrandtsen Lines, Inc. Plaintiff's work in such capacity involved his giving instructions to shipmates regarding painting, chipping, scraping and the handling of booms. (N.T. 11)

7. During the calendar year 1968, plaintiff sailed as a merchant seaman for 290 days. During the calendar year 1969, plaintiff sailed for 277 days. During calendar year 1970, until August 18, plaintiff sailed for 112 days, having taken between February 9 and May 8 of that year a three month vacation to which his prior years of service had entitled him.

8. Following his vacation, plaintiff rejoined the S.S. Export Champion in his capacity as a bosun on May 8, 1970.

9. During the month of May, 1970, and specifically around the middle of that month, plaintiff injured his left hip when a block he and several shipmates were moving pushed plaintiff against a steel bitt, to which a ship's tie line is fastened. (N.T. 81–92)

10. Plaintiff did not report this injury to anyone. (N.T. 83)

11. On or about May 22, 1970, plaintiff began to feel pain in his left hip area. (N.T. 15)

12. The pain which plaintiff felt involved his left upper leg, from hip to knee. (N.T. 19)

13. This pain began after plaintiff had strained his leg while lifting a gin block while working on the Export Champion. (N.T. 89)

14. At the time of this incident, the Export Champion was in the New York area. (N.T. 18)

15. Plaintiff's ship sailed from the New York area one or two days after the May 22, 1970, incident described above. (N.T. 18)

16. The ship was headed for San Pedro, California. (N.T. 18)

17. The voyage of plaintiff's ship from New York to San Pedro took be-

tween seventeen (17) and nineteen (19) days. (N.T. 18)

18. During the course of the voyage, the pain in plaintiff's hip area increased. (N.T. 18, 19)

19. As a result of such pain and difficulty with his leg, plaintiff on June 5, 1970, sought medical attention from the purser aboard the Export Champion. On that date, the purser made an entry in the ship's medical log with respect to plaintiff which read: "Pain in upper leg, left; felt after lifting a gin block 5–22; still bothered by pain." (N.T. 20, Ex. P–3) In addition, the purser gave plaintiff some liniment and told him, with respect to the possibility of plaintiff's seeing a doctor, to wait until the ship reached San Pedro, where plaintiff would go to the United States Public Health Clinic ("Public Health"). (N.T. 21)

20. Under the Public Health Service Act, 42 U.S.C. § 249, plaintiff or any other merchant seaman, unless he wishes to pay for his own treatment, was required to report to the United States Public Health Service for treatment of any injuries sustained during the course of his employment as a merchant seaman of the United States and had no freedom of choice with respect to the selection of a physician or medical facility to treat his injuries without the express authorization and approval of the United States Public Health Service. (N.T. 566)

21. A vessel or an employer of a merchant seaman need not honor a "not fit for duty" slip from anyone other than the United States Public Health Service. (N.T. 567)

22. Plaintiff's ship arrived at San Pedro on approximately June 7, 1970, at which point plaintiff initially sought to proceed to Public Health, but could not because it was Sunday and the Public Health clinic was closed. Plaintiff was thereupon referred by the Public Health Service to the Long Beach Memorial Hospital, Long Beach, California. (N.T. 24, 25, 575, Ex. P–4)

23. Plaintiff was referred to the Long Beach Memorial Hospital only because the United States Public Health Service Clinic in San Pedro was closed. Had the Public Health Clinic in San Pedro been open, plaintiff would have been treated there and not referred elsewhere. (N.T. 569)

24. The United States Public Health Service at San Pedro had all the facilities which examination and treatment of plaintiff would have required. (N.T. 570–572)

25. Plaintiff had no choice, so long as he did not wish to pay his own medical bills, of an alternate facility to the Long Beach Memorial Hospital to which the Public Health Service referred him. If he desired treatment which he would not have to pay for himself, he had to go where the Public Health Service directed him. (N.T. 574)

26. On June 7, 1970, Long Beach Memorial Hospital would not have treated plaintiff or any merchant seaman unless it received permission from the Public Health Service. (N.T. 575)

27. The officer of the United States Public Health Service at San Pedro who referred plaintiff to Long Beach Memorial Hospital was Dr. Cooper, a physician. (Ex. P–4, N.T. 575)

28. On June 7, 1970, Long Beach Memorial Hospital was under contract with the United States Public Health Service to give competent medical treatment and attention to Public Health beneficiaries. (N.T. 575)

29. Under such contract, Long Beach Memorial Hospital agreed to comply with minimum standards of medical practice in the attention and treatment it gave Public Health beneficiaries. (N.T. 575)

30. Under such contract, Long Beach Memorial Hospital agreed to comply with minimum standards of medical practice in the attention and treatment it gave Public Health beneficiaries. (N.T. 576)

31. The contract between the United States Public Health Service and Long Beach Memorial Hospital provided, *inter alia,* that in assuming responsibility for the treatment and care of Public Health Service patients, Long Beach Memorial Hospital would be "acting for the Public Health Service." (Ex. G–4, N.T. 578)

32. Under its contract with Long Beach Memorial Hospital, the Public Health Service reserved the right to arrange for consultation services of qualified specialists not on the staff of Long Beach Memorial Hospital, whenever the Public Health Service believed such consultation necessary. (N.T. 579)

33. Under the same contract, the Public Health Service reserved the right to transfer a Public Health Service patient from Long Beach Memorial Hospital whenever the Public Health Service believed the technical capacity of Long Beach Memorial Hospital was insufficient for adequate diagnostic or therapeutic control. (N.T. 580)

34. Also under this contract, the Public Health Service reserved the right to designate particular medical officers on its staff to go into Long Beach Memorial Hospital and have therein the same rights and privileges as the hospital's own medical staff. (N.T. 580)

35. Under this contract, the Public Health Service had at all times the right to control the treatment of its patients in Long Beach Memorial Hospital. (N.T. 581)

36. On June 7, 1970, plaintiff was examined by a physician in the emergency room of Long Beach Memorial Hospital. (Ex. P–4)

37. The hospital record of plaintiff's visit at Long Beach Hospital that day states:

"History, Physical and X-ray Findings: Patient strained his left leg about three weeks ago but now is feeling pretty good. The Old Man wanted him to come down to have it checked. Examination negative."

"Diagnosis: strained left leg (history of, treatment advised)" (Ex.P–4)

38. The "Old Man" to which the report refers would be the ship's captain. (N.T. 96)

39. This examination of plaintiff at Long Beach Memorial Hospital on June 7, 1970, was brief, lasting somewhere between three and thirty minutes. (N.T. 26, 28, Ex. P–4)

40. During this examination, the examining physician asked plaintiff to drop his trousers, looked at plaintiff, and asked what was wrong. Plaintiff responded that the area of his upper left leg hurt, in the area approximately from the knee to the groin. (N.T. 26)

41. The examining physician thereupon told plaintiff to take it easy, not to put so much weight on his leg and not to do too much work. (N.T. 28)

42. The examining physician did not touch or otherwise feel the area of plaintiff's leg to which plaintiff had referred. (N.T. 26)

43. The examining physician did not place plaintiff on a table and put plaintiff's leg through any kind of motions and ask if such motions caused pain. (N.T. 26)

44. The examining physician did not ask plaintiff to bend or extend his leg in any way. (N.T. 27)

45. Other than eliciting the information that plaintiff had strained his leg, (Ex. P–4), the examining physician did not ask plaintiff further questions about how his injury had occurred. (N.T. 100)

46. Nor did the physician ask plaintiff where in particular the leg hurt, or how frequently plaintiff was experiencing pain. (N.T. 101)

47. Other than advising plaintiff to take it easy, the examining physician did not advise plaintiff about continuing his voyage or work aboard the Export Champion. (N.T. 28)

48. The examining physician did not give plaintiff a certificate of any kind stating that plaintiff should be relieved of work duty or given only light work. (N.T. 29)

49. Such certificate is the only means by which a seaman can be relieved of work duty, either partially or entirely. (N.T. 28, 29)

50. The examining physician knew or should reasonably have known that plaintiff worked on a ship, since this information was set forth on the record made of plaintiff upon his admission to the Long Beach Memorial Hospital, and this record was given to the physician who examined plaintiff. (Ex. P–4)

51. The failure of the examining physician at Long Beach Memorial Hospital on June 7, 1970, to give plaintiff a certificate or slip stating that plaintiff should be relieved completely of duty if pain in his leg continued thus allowed and caused plaintiff to have to continue to perform his work aboard the S.S. Export Champion from June 7, 1970, until the ship's voyage ended on August 18, 1970.

52. After his examination, plaintiff was given a form to sign, which he did sign but did not read, and which stated that he understood the treatment he had received was temporary and that he should seek follow-up and definitive care from another physician. (Ex. P–4)

53. After examining plaintiff, the examining physician designated on plaintiff's hospital record that plaintiff was discharged. (Ex. P–4)

54. Minimum medical standards for examinations of the musculoskeletal anatomy by emergency room physicians are the same throughout the communities of the United States. (N.T. 347)

55. The examination of plaintiff by the emergency room physician at Long Beach Memorial Hospital on June 7, 1970, failed to comply with such minimum standards in that the examining emergency room physician failed to put plaintiff's left upper leg and hip area through a range of motions, failed to palpate such area for tenderness, failed

to perform reflex analysis, and failed to request x-rays of such area, in which plaintiff claimed pain had existed for three weeks. (N.T. 349, Deposition of Dr. Klinghoffer, pp. 44, 45)

56. The examination of plaintiff at Long Beach further fell below such minimum examination standards in that the examining physician, faced with a patient whose record expressly stated he was a merchant seaman, failed to ascertain when the plaintiff would be able to see a doctor again if his trouble persisted, failed to give plaintiff specific instructions what to do if his pain persisted, and failed to take a more complete examination and x-rays of plaintiff in order to obtain firmer reassurance that plaintiff could return to work, and instead simply advised plaintiff to take it easy, which was unrealistic advice for a man who worked on a ship at sea. (N.T. 350, 357)

57. The examination of the examining physician at the Long Beach Memorial Hospital on June 7, 1970, when faced with a seaman, attached to a merchant vessel, who complained of pain originating with one or two incidents of trauma and extending over a duration of three weeks, in failing to inquire further into plaintiff's particular work duties, constituted conduct by that physician which did not comport with minimum medical standards. (N.T. 272)

58. The treatment given plaintiff at Long Beach Memorial Hospital on June 7, 1970, failed to comport with minimum medical standards in that the examining physician, faced with a patient with pain in his upper left leg for three weeks and who worked on a merchant ship, failed to give such patient a certificate or slip stating that such patient should have light duty, and if he continued to have distress he should be taken off work duty altogether and should have medical attention as soon as possible. (N.T. 273)

59. After his examination at Long Beach Memorial Hospital, plaintiff returned to the Export Champion, which subsequently left for Yokohama, Japan. During this voyage, plaintiff performed his regular duties. (N.T. 29, 30)

60. After his examination at Long Beach, and during the above described subsequent voyage, plaintiff continued to have pain in his left leg. (N.T. 30)

61. Plaintiff complained of this pain to the ship's purser, who gave him liniment, and at one point also gave plaintiff a knee cap, since plaintiff had pain in his knee as well. (N.T. 30, 31)

62. This voyage of the Export Champion ended on August 18, 1970, in New York.

63. The failure of the examining physician at Long Beach Memorial Hospital on June 7, 1970, to give plaintiff a certificate whereby he could have been relieved of duty had pain in his leg continued thus allowed and caused plaintiff to continue to work throughout the Export Champion's voyage from June 7, 1970, until August 18, 1970.

64. On August 20, 1970, plaintiff visited the Outpatient Clinic at the United States Public Health Service on Staten Island, (N.T. 31), where a physician examined him. (N.T. 32). On such visit, plaintiff complained, as at Long Beach, about pain in his upper left leg, from the knee to the hip.

65. The examining physician gave plaintiff a certificate stating plaintiff should be relieved of duty, and should report on August 28, 1970, to the United States Public Health Service in Puerto Rico. (N.T. 33) Plaintiff had told the physician that if he would have to spend time in a hospital, he would prefer to do so in Puerto Rico, where he and his family lived. (N.T. 32, 33)

66. On August 28, 1970, plaintiff reported to the United States Public Health Service facility at San Juan, Puerto Rico, (N.T. 34) where he again complained of pain in his upper left leg from the hip through the groin to the knee. (N.T. 35)

67. At the San Juan Public Health facility, plaintiff was examined by Dr. A. L. Springer. (N.T. 155)

68. On the date of this examination, August 28, 1970, Dr. Springer made the following notation concerning plaintiff in the San Juan Public Health Clinic's records:

"On or about May 27, he was pulling on something when his leg slipped and he experienced a pain in upper inner part of thigh. He continued to work but pain has continued."

69. Plaintiff did not expressly mention pain in his hip in particular, but referred generally to pain in his upper leg.

70. Dr. Springer examined the adductor muscles of plaintiff's left leg, which ran along the inside of the thigh, from knee to the pelvic bone, about two inches from the hip socket. (N.T. 156, 157, 160)

71. Dr. Springer's examination of plaintiff revealed tenderness in plaintiff's upper inner thigh. Dr. Springer diagnosed this tenderness as strain of the adductor muscles. (N.T. 157, Ex. P–5A)

72. As treatment, Dr. Springer prescribed diathermy for plaintiff. (Ex. P–5A)

73. Dr. Springer did not check the range of motion in plaintiff's left leg. (N.T. 159)

74. Dr. Springer did not have any x-rays taken of plaintiff. (Ex. P–5A, N.T. 36, 37)

75. Dr. Springer's examination and treatment of plaintiff on August 28, 1970, did not comply with minimum standards of medical treatment in that Dr. Springer, encountering a patient with a history of three months of pain involving the inner side thigh up to the end of the adductor muscles, did not have x-rays taken of plaintiff's hip joint area before initiating a therapeutic program for plaintiff, and did not advise plaintiff to stay off his feet until the x-rays were analyzed. N.T. 245–247, 250, 353)

76. This conclusion that Dr. Springer's examination and treatment on August 28, 1970, did not meet minimum standards remains the same whether or not plaintiff expressly complained of pain specifically in his hip, since the upper ends of the adductor muscles lie at the periphery of the hip joint, control motion through the hip joint, and are thus intimately associated with the hip joint. Accordingly, when the hip joint goes awry for any number of reasons, the adductor muscles will become tender. Persistence of tenderness in the upper adductor muscles thus constitutes extremely high cause for suspicion of a possible hip derangement. (N.T. 245–247, 250, 262)

77. Given the history which Dr. Springer had from plaintiff, and the results Dr. Springer himself found in examining plaintiff, in failing to take an x-ray of plaintiff, Dr. Springer failed to act in accordance with minimum standards of medical care required of an outpatient clinic such as the United States Public Health Service in San Juan. (N.T. 357, Deposition of Dr. Klinghoffer, p. 34)

78. In his failure to have x-rays taken of plaintiff, under the circumstances of plaintiff's case, Dr. Springer failed to act in accordance with reasonable and prudent standards of medical care. (N.T. 355, Deposition of Dr. Klinghoffer, pp. 33, 34)

79. After his examination by Dr. Springer, plaintiff received diathermy treatments several times a week until October 9, 1970. (N.T. 37, 158, Ex. P–5A)

80. Between August 28, 1970, when plaintiff was examined by Dr. Springer, and October 9, 1970, the diathermy treatments were the only treatments plaintiff received at San Juan Public Health. (N.T. 38, Ex. P–5A)

81. During the course of the diathermy treatments, Dr. Springer advised plaintiff to keep weight off his leg. (N.T. 151)

82. On October 9, 1970, after plaintiff had shown no improvement from six weeks of diathermy treatments, Dr. Springer referred plaintiff to Dr. Rodriguez-Christensen, an orthopedic specialist. (N.T. 37, 46, Ex. P–5A)

83. On October 14, 1970, plaintiff was examined by Dr. Rodriguez-Christensen, who directed x-rays to be taken the same day of plaintiff's left leg. (N.T. 504, Ex. P–5A)

84. The x-rays revealed in plaintiff's left hip area a condition of "early avascular (aseptic) necrosis and "slight irregularity of the femoral head." (Ex. P–5A)

85. Aseptic or avascular necrosis is the medical term used to designate a condition in which bone tissue has died because the blood supply to that tissue has been cut off. (N.T. 181)

86. The most common cause for such a reduction in blood supply to bone tissue is trauma or injury which will occlude to some degree the vessels which supply blood to the bone tissue. (N.T. 248)

87. In the case of the hip joint, the most common type of externally-caused trauma or injury resulting in reduced blood supply to the bones of the hip joint is a protracted stretch through the capsula of the hip joint, otherwise described as a strain through the groin or hip joint. Such stretch of the capsula of the hip joint interferes with the blood supply to the femoral head. (N.T. 248, 249)

88. In the case of the avascular necrosis of plaintiff's left femoral head, such necrosis was caused either solely by the incident of May 22, 1970, in which plaintiff had strained his leg while lifting a gin block on the Export Champion, or by the combination of this incident acting upon a possible pre-existing condition in plaintiff's left femoral head which rendered such head vulnerable to any vascular necrosis. (N.T. 185)

89. The avascular necrosis in plaintiff's left femoral head existed at the time of plaintiff's examination at Long Beach on June 7, 1970. (Deposition of Dr. Klinghoffer, pp. 45, 48)

90. The avascular necrosis in plaintiff's left femoral head thus also existed as of August 28, 1970. (Deposition of Dr. Klinghoffer, p. 48; N.T. 257)

91. X-rays constitute the only means other than radio isotopes by which a physician can determine with certainty whether a vascular condition exists in a hip joint. (N.T. 246)

92. Had x-rays been taken of plaintiff's left hip on June 7, 1970, such x-rays would have revealed the avascular necrosis in plaintiff's left femoral head. (Deposition of Dr. Klinghoffer, pp. 45, 48)

93. Had x-rays been taken of plaintiff's left hip on August 28, 1970, such x-rays would have revealed the existence of the aseptic or avascular necrosis in that hip. (N.T. 257, 354)

94. When such necrosis or death occurs in bone tissue, the tissue becomes very soft. (N.T. 182)

95. Ordinarily, the body will in time renew the blood supply to the bone tissue in which such necrosis has occurred. In the event the body fails so to revascularize the bone tissue, surgical procedures can accomplish the revascularization. (N.T. 263)

96. When revascularization occurs, whether by natural or surgical means, the bone tissue in which the necrosis has occurred will regain its hard character and will retain its normal anatomical structure. (N.T. 264)

97. Until such revascularization process has been completed, however, and while the bone tissue in which the necrosis has occurred is still soft, the bone may become deformed at the location of such soft tissue if external force is applied to such location. (N.T. 182, 187)

98. Any such deformity of bone tissue because of the application of external force to bone tissue which has suffered necrosis or death is irreversible. Once the deformity occurs, it is permanent.

The body cannot repair such deformity, and the bone will thus retain the deformed character. (N.T. 188, 189)

99. In the case of the bone tissue comprising the femoral head, if necrosis has occurred in such tissue, the application of normal body weight, as in walking or standing, is sufficient to cause permanent deformation of that tissue. (N.T. 182)

100. Accordingly, under any competent medical standards, the normal treatment for a condition of aseptic necrosis, is to have the patient immediately remove absolutely all weight of any type through the hip joint, through the use of crutches or even hospitalization. (N. T. 187, 354)

101. The deformity in plaintiff's left femoral head was caused by continued weight-bearing on his left leg between the onset of the aseptic necrosis and October 14, 1972. (N.T. 339)

102. No collapse or deformity of plaintiff's left femoral head occurred prior to June 7, 1970. (N.T. 260, 261, Deposition of Dr. Klinghoffer, pp. 34, 35)

103. As of August 28, 1970, deformity of plaintiff's left femoral head had not yet occurred or had occurred to a substantially lesser degree than that which existed by the time x-rays were finally taken on October 14, 1970. (N.T. 260, N.T. 356, 358, 359)

104. The failure of the examining physician at Long Beach Memorial Hospital on June 7, 1970, to have x-rays taken of plaintiff's left hip, and the failure to have plaintiff initiate a total non-weight bearing condition on his left leg as of that date, or to instruct plaintiff to initiate such condition if his pain continued, and the related failure of the examining physician to give plaintiff a certificate to such effect for presentation to plaintiff's superiors aboard ship, individually and cumulatively allowed and caused plaintiff to continue to bear weight on his left leg after June 7, 1970, and thus allowed and caused any deformity which developed in plaintiff's left

femoral head between June 7, 1970, and August 28, 1970. (Deposition of Dr. Klinghoffer, p. 45)

105. The failure of the United States Public Health Service on August 28, 1970 to x-ray and thus identify the aseptic necrosis in plaintiffs' left femoral head, which identification would have necessitated the initiation of an immediate non-weight-bearing condition on plaintiff's left leg, thus allowed and caused plaintiff to continue to bear weight on his left leg from that date until October 14, 1970, and thus allowed and caused any deformity which developed in plaintiff's left femoral head between August 28, 1970, and October 14, 1970.

106. On October 19, 1970, at the direction of Dr. Rodriguez-Christensen, plaintiff was given crutches at Public Health in San Juan and instructed in how to use them. (Ex. P–5A)

107. From October 19, 1970, when plaintiff first received crutches, until March 21, 1973, plaintiff used the crutches at all times and avoided putting weight on his left leg. (N.T. 44, 53)

108. During this period, plaintiff continued to experience varying degrees of pain in his upper left leg. (N.T. 52)

109. During the period of time plaintiff was treated in San Juan, he remained on the "not fit for duty" status on which he had been placed at Staten Island. (N.T. 46)

110. On May 24, 1971, plaintiff was certified as "permanently unfit for sea duty" by the United States Public Health Service at San Juan. (N.T. 47, Ex. P–5A)

111. Plaintiff has remained on such "not fit for duty status" through the present time. (N.T. 58)

112. Since plaintiff left the Export Champion on August 18, 1970, he has engaged in no gainful employment whatsoever. (N.T. 59)

113. During the period from October 19, 1970, until March 21, 1973, plaintiff's leg was x-rayed periodically on the di-

rective of Dr. Rodriguez-Christensen. (N.T. 45, Ex. P-5A)

114. These x-rays revealed that the deformity in the femoral head of plaintiff's left leg, which deformity the x-rays of October 14, 1970, had first revealed, had not improved or changed in any way.

115. This deformity and destruction of plaintiff's left femoral head was subsequently determined in early 1973 to be a permanent condition, and reconstructive surgery was recommended to repair this condition. This recommendation was first made by a private physician whom plaintiff contacted on his own, and then by Dr. Rodriguez-Christensen. (N.T. 49-52)

116. On March 21, 1973, plaintiff was admitted to the United States Public Health Service Hospital at Staten Island, New York, where he remained until April 26, 1973.

117. During the course of this hospitalization, specifically on March 30, 1973, surgeons at the Staten Island Public Health Hospital inserted an Austin-Moore prosthesis into plaintiff's left hip.

118. The operation in which the Austin-Moore prosthesis was inserted involved two steps.

First, surgeons removed a portion of the normal anatomical structure of plaintiff's left femoral neck and the entirety of the normal anatomical structure of plaintiff's left femoral head. (N.T. 198)

Second, surgeons then inserted into plaintiff's left femur an Austin-Moore prosthesis, consisting of a metal ball on a rod. Such metal ball is designed to replace the natural femoral head and to rotate in the hip socket. (N.T. 199)

119. The Austin-Moore prosthesis was necessitated in plaintiff's case by the extent of the deformity and destruction of plaintiff's left femoral head. (N.T. 259, 260)

120. The above-described failure of the Long Beach Memorial Hospital on June 7, 1970, and the United States Public Health Service at San Juan on August 28, 1970, to examine and treat plaintiff according to minimum and reasonable medical standards, which failures allowed and caused the collapse and deformity of plaintiff's left femoral head, thus caused the necessity for the insertion of the Austin-Moore prosthesis in plaintiff's left hip.

121. The Austin-Moore prosthesis in plaintiff's left hip will not last more than approximately five to 10 years, at which point plaintiff will require another operation to insert a new Austin-Moore prosthesis. (N.T. 200)

122. At the time of this later operation, plaintiff will also require the insertion of a cap arthroplasty to replace the normal anatomical structure of plaintiff's left hip socket or acetabulum, which will have to be removed. (N.T. 200)

123. Plaintiff was told soon after his operation that he would need the above-described additional operation in the future. (N.T. 54)

124. During the period of plaintiff's recovery from the operation, plaintiff experienced significant pain and discomfort as a result of the operation. (N.T. 53)

125. Plaintiff continued to use crutches for approximately six months after his operation. (N.T. 44, 54)

126. From the time he ceased using crutches after his operation, plaintiff has had to use a cane at all times when walking. (N.T. 57)

127. Since his release from the hospital on Staten Island, plaintiff has continued to suffer varying pain, discomfort, and stiffness in the area of his left hip, including his upper left leg and left hip joint. Plaintiff incurs pain in his left hip area when lying on his left side, and plaintiff cannot sit, stand, or lie in the same position for any extended length of time without developing pain, discomfort, and stiffness in his left hip area. (N.T. 58)

128. Plaintiff has a 10 degree loss of the ability to rotate or turn his leg inward through the hip joint. (N.T. 194)

129. Plaintiff has similarly suffered a loss of 15 degrees in his ability to rotate his left leg externally or outwardly through the hip. (N.T. 194)

130. Plaintiff now has a limited ability to move his leg sideways in an outward direction. (N.T. 174)

131. Plaintiff has similarly suffered a slight loss of the ability to move his left leg sideways in an inward direction. (N.T. 175)

132. Plaintiff's left thigh muscles have suffered a medically significant degree of muscle shrinkage or atrophy, to the extent of measuring three quarters an inch less in circumference than the right thigh muscles. (N.T. 175)

133. Plaintiff has a flexion contraction of 10 degrees through the left hip joint. (N.T. 173, 175)

134. Plaintiff's right leg is now one-half inch shorter than his left as a result of the insertion of the prosthesis in his left femur. (N.T. 340)

135. The difference in length between plaintiff's legs, even though compensated by an elevation in his right shoe, will cause a possibility of earlier difficulties with the prosthesis than if plaintiff's legs were the same length. (N.T. 341)

136. The present condition of plaintiff's left hip will not improve, and will instead worsen, especially after the total hip replacement surgery plaintiff will require within five to ten years.

137. Plaintiff will continue for the rest of his life to require a cane in order to walk.

138. Plaintiff will continue for the rest of his life to experience pain and discomfort in his left hip area.

139. Prior to May 22, 1970, plaintiff was physically fit and fully capable of performing all his duties and functions as a bosun aboard the S.S. Export Champion.

140. Since August 18, 1970, plaintiff's hip condition has disabled him totally from working in the capacity of a bosun, a merchant seaman, or in any other capacity as a seaman, or in any other type of work, on land or sea, involving working on his feet or lifting heavy objects. (N.T. 187, 203)

141. Such total disability will remain with plaintiff for the rest of his life. (N.T. 187, 203, Deposition of Dr. Leonard Klinghoffer, p. 28)

142. The only type of work plaintiff could now do would be of a sedentary nature. (N.T. 203)

143. Plaintiff, age 49, has a normal remaining life expectancy of 22.2 years. (N.T. 4, 5)

144. If he were not disabled, plaintiff would have a remaining future work life expectancy of approximately fifteen years, assuming he retired at age sixty-five.

145. The above-described failures of the Long Beach Memorial Hospital on June 7, 1970, and the United States Public Health Service at San Juan on August 28, 1970, and thereafter to examine, diagnose, and treat plaintiff in accordance with minimum and reasonable medical standards, which failures allowed and caused the collapse and deformity of plaintiff's left femoral head thus causing plaintiff's disability.

146. Had no collapse and deformity of plaintiff's left femoral head occurred, the condition of aseptic necrosis in that femoral head would have disabled plaintiff from his employment as a bosun or merchant seaman for approximately twelve to fifteen months from the time treatment for such necrosis began. (N.T. 266, 267)

147. At the end of such twelve to fifteen month period of disability from the aseptic necrosis, plaintiff could have returned to his position as bosun aboard the S.S. Export Champion, fully capable of performing all duties and functions which such position entailed. (N.T. 266)

148. Under minimum and reasonable medical standards, as described above, diagnosis and the beginning of treatment of the aseptic necrosis in plaintiff's left femoral head should have occurred on June 7, 1970, at Long Beach, or at the

very least no later than August 28, 1970, at the United States Public Health Service at San Juan.

149. Accordingly, had such treatment begun at such time, and had no collapse and deformity occurred in plaintiff's left femoral head, plaintiff's period of. disability would not have extended beyond June 7, 1971.

150. Accordingly, at the very least, the failures of the Long Beach Memorial Hospital on June 7, 1970, and the United States Public Health Service at San Juan on August 28, 1970, to examine and treat plaintiff in accordance with minimum and reasonable medical standards under the circumstances, which failures so to treat plaintiff allowed the collapse and deformity of plaintiff's left femoral head, caused any disability of plaintiff beyond June 7, 1971.

151. Between June 7, 1971 and June 15, 1975, from his employment as a bosun plaintiff would have received total economic benefits in the amount of approximately $75,539.43 consisting of base wages, overtime pay, vacation pay, and pension and welfare payments. (Ex. P–11)

152. This figure consists of what plaintiff would have received in such benefits over the time period from June 16, 1971, to June 15, 1975. (Ex. P–11)

153. Under the current National Maritime Union contract's terms, plaintiff's projected gross earnings from June 16, 1975 until plaintiff reached age sixty-five would be $305,479.35. This figure consists of the total annual benefits under the current contract, which amount to $20,365.29, multiplied by fifteen, the number of years until plaintiff reaches age sixty-five. (Ex. P–11, N.T. 484)

154. The immediately preceding computation was made, as noted, on the assumption that plaintiff would not have worked beyond the age of sixty-five. In the maritime industry, however, there is no normal retirement age for seamen. Plaintiff thus possibly could have worked beyond age sixty-five, in which case the total earnings for his remaining work life expectancy would have exceeded the figure of $305,479.35 computed above. (N.T. 484, 485)

155. Reduced to present value at the rate of 6% simple interest over the above-described fifteen year period, this gross figure of $305,479.35 amounts to $213,108.50.

156. Because plaintiff is still capable of doing some type of sedentary work, we believe the compensation for plaintiff's lost future earnings should be reduced to $188,108.50.

157. Plaintiff's past, present, and future pain and suffering, caused by the negligence of the examining physician at Long Beach Memorial Hospital and the United States Public Health Service at San Juan, Puerto Rico, merits compensation in the amount of $25,000. As noted above, plaintiff suffered considerable discomfort and pain for the four months from his accident in May until he was put on crutches in October, underwent an operation which caused him additional pain, and has continued to have and will continue to suffer pain and discomfort in his hip for the rest of his life, besides having as well to undergo another operation of his hip in no more than ten years from the present time.

## CONCLUSIONS OF LAW

1. We have jurisdiction under 28 U.S. C. § 1346(b) (1962), of this claim against the United States for money damages resulting from alleged medical malpractice by an employee or agent of the United States Government.

2. Under 28 U.S.C. § 1346(b) (1962), the United States is liable for personal injury or loss of property

" . . . caused by the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment, under circumstances where the United States, if a private person, would be liable to the claimant in ac-

cordance with the law of the place where the act or omission occurred."

3. Similarly, 28 U.S.C. § 2674 (1965) provides that the liability of the United States in tort exists to the same extent and in the same manner as that of a private individual under like circumstances.

4. The tort liability of the United States under 28 U.S.C. §§ 1346(b) and 2674 extends to cases of medical negligence or malpractice. See e. g., Clark v. United States, 402 F.2d 950 (4th Cir. 1968).

5. The United States Public Health Service has the statutory duty to provide medical care to all legitimate Public Health Service Act beneficiaries. 42 U.S.C. § 249(e) (1974).

6. As a seaman, plaintiff was a legitimate beneficiary of the Public Health Service Act. 42 U.S.C. § 249 (1974).

7. Under 28 U.S.C. § 2671 (Supp. 1975), the term "employee of the government" for purposes of 28 U.S.C. § 1346 (b) includes "officers and employees of any federal agency."

8. The United States Public Health Service is clearly a federal agency. 42 U.S.C. § 201 et seq., and § 233 (1974).

9. Under 28 U.S.C. § 1346(b) (1962), therefore, the United States is liable for the negligence of any employee or officer of the United States Public Health Service, including acts of medical negligence, where such negligence occurs while the employee or officer is acting within the scope of his employment.

10. Under 28 U.S.C. § 2671 (Supp. 1975), the term "employee of the government" for purposes of 28 U.S.C. § 1346 (b) also includes

". . . persons acting on behalf of a federal agency in an official capacity, temporarily or permanently in the service of the United States, whether with or without compensation."

11. In determining whether an individual acted "on behalf of a federal agency" so as to qualify as an "employee" of the government under 28 U.S.C. §§ 1346(b) and 2671 (Supp.1975), a court must consider all facts of the relationship between the individual and the federal agency, and the principal consideration is the degree of control the agency retains over the individual, whether or not the agency ever actually exercises this control. See, e. g., United States v. N. A. Degerstrom, Inc., 408 F.2d 1130, 1132 (9th Cir. 1969); Witt v. United States, 462 F.2d 1261 (2nd Cir. 1972); Close v. United States, 130 U.S.App.D.C. 125, 397 F.2d 686 (1968).

In Witt, for example, a private military club requested federal prisoners for a work detail, the prison consigned the prisoners to the club, the club contracted with a civilian to manage the work detail, and this civilian in turn contracted with another civilian to transport the prisoners to the club. When the negligence of this latter civilian caused injury to a prisoner en route, the injured prisoner sued the federal government, and the Court of Appeals held the civilian who had transported the prisoners an "employee" of the government because he acted on behalf of the federal prison in such transportation task. The Court reasoned that the transporting civilian was authorized by the prison to transport the prisoners, and was amenable to some degree of control by the prison. 462 F.2d at 1264.

12. In the instant case, the Long Beach Memorial Hospital and its emergency room physician who examined plaintiff on June 7, 1970, clearly acted at that time on behalf of the United States Public Health Service at San Pedro. The Public Health Service sent plaintiff to Long Beach Memorial Hospital only because Public Health was closed, and Long Beach had a contract with Public Health to provide medical care to Public Health beneficiaries. Under this contract, Public Health retained the complete right to control the treatment of its beneficiaries at Long Beach, to the extent even of removing its patients from Long Beach or having Public Health staff members enter Long Beach to administer treatment to Public Health beneficiaries.

13. In the instant case, the examining physician at Long Beach Memorial Hospital on June 7, 1970, thus qualified as an "employee" of the federal government under 28 U.S.C. §§ 1346(b) and 2671 (Supp.1975).

14. Accordingly, the United States is liable under 28 U.S.C. § 1346(b) for any negligence committed by the examining physician at Long Beach Memorial Hospital on June 7, 1970.

15. In general, the standard by which a court must determine whether a physician has committed malpractice is whether the physician exercised that degree of skill and diligence employed by the ordinary, prudent practitioner in the community. See Clark v. United States, 402 F.2d 950 (4th Cir. 1968).

16. Under the substantive law of California, by which we must judge the conduct of the physician who examined plaintiff at Long Beach Memorial Hospital on June 7, 1970, a physician commits professional negligence if he fails to exercise that reasonable degree of skill, knowledge, and care ordinarily possessed and exercised by members of the profession in the same locality under similar circumstances. United States v. Canon, 217 F.2d 70 (9th Cir. 1954); Lashley v. Koerber, 150 P.2d 272, 275 (Cal.App.1944).

17. Under the substantive law of Puerto Rico, by which we must judge the claim of negligence against the United States Public Health Service at San Juan for its treatment of plaintiff on August 28, 1970, negligence of a physician is to be determined by the standard of care ordinarily adhered to in similar circumstances by other physicians of the locality. Santa v. United States, 252 F. Supp. 615 (D.P.R.1966).

18. Plaintiff produced sufficient expert testimony to establish the medical standards by which we must judge the conduct of the physicians who examined plaintiff at Long Beach Memorial Hospital on June 7, 1970, and the United States Public Health Service at San Juan on August 28, 1970.

19. Both Dr. Krause and Dr. Beller testified that basic, universally applicable medical standards govern the examination, diagnosis, and treatment of a person under the circumstances in which plaintiff presented himself at both Long Beach and San Juan. According to the testimony of both doctors, these standards are part of the basic instruction which every medical student receives, much less every student who proceeds to specialize in orthopedics. (N.T. 213–220, 342–349).

20. In addition, Dr. Beller teaches at a medical school with students from all parts of the United States, serves as an examining physician for the American Board of Orthopedic Surgery, in which capacity he examines student candidates for the field of orthopedics from all parts of the United States, and serves actively as a member of other medical organizations in work which maintains his knowledge of orthopedics and general emergency room practice throughout the United States. (N.T. 342–345)

21. The above-described failure of the examining physician at Long Beach Memorial Hospital to examine, diagnose, and treat plaintiff on June 7, 1970, in accordance with minimum and reasonable medical standards under the circumstances constituted negligent examination, diagnosis, and treatment.

22. The above-described failure of the United States Public Health Service at San Juan, Puerto Rico, to examine, diagnose, and treat plaintiff on August 28, 1970, in accordance with minimum and reasonable medical standards under the circumstances, and specifically the failure to x-ray plaintiff's left hip constituted negligence.

23. This negligent examination, diagnosis, and treatment of plaintiff by Long Beach Memorial Hospital on June 7, 1970, and the United States Public Health Service at San Juan on August 28, 1970, in allowing plaintiff to continue to bear weight on his left hip proximately caused the ultimate collapse and deformation of plaintiff's left femoral head and thus

proximately caused plaintiff's disability after June 7, 1971, the date by which plaintiff would have recovered from the aseptic or avascular necrosis in his left femoral head had he been properly treated and directed to remove all weight-bearing from his left hip as of June 7, 1970, when he visited Long Beach Memorial Hospital.

24. The negligence of the examining physician at Long Beach Memorial Hospital on June 7, 1970, and the United States Public Health Service at San Juan on August 28, 1970, in proximately causing plaintiff's disability after June 7, 1971, thus proximately caused plaintiff's loss of employment earnings of $75,539.-50, from June 16, 1971, until June 16, 1975, and will proximately cause plaintiff a loss of future earnings of approximately $188,108.50, when adjusted for present value and for the possibility of plaintiff's working in a sedentary capacity.

25. Because the negligence of the physician at Long Beach Memorial Hospital on June 7, 1970, is attributable to the United States Public Health Service at San Pedro, California, and because the negligence of the United States Public Health Service at San Juan on August 28, 1970, is likewise attributable to the United States Public Health Service, all disability, lost earnings, and other compensable damages of plaintiff after June 7, 1971, fall within the legal responsibility of the United States Public Health Service.

26. Because the United States Public Health Service constitutes an agency of the United States of America, and because the United States of America is liable for negligence on the part of the United States Public Health Service which proximately causes injury to a beneficiary of the United States Public Health Service, the United States of America is thus legally responsible and liable for all disability, lost earnings, and other compensable damages suffered by plaintiff after June 7, 1971.

27. The argument of the Defendant United States of America that any negligence by the United States Public Health Service at San Juan on August 28, 1970, made little difference in the ultimate collapse and deformity of plaintiff's left femoral head does not change defendant's liability.

For one thing, even if such argument were true, and the ultimate collapse and deformity of plaintiff's left femoral head had already substantially occurred by August 28, 1970, the full responsibility for such collapse of plaintiff's left femoral head would thus fall simply on the negligence of the Long Beach Memorial Hospital on June 7, 1970, for which as we have already noted the United States must bear the legal liability.

The testimony in this case, however, does not establish with certainty that the full or substantial extent of the deformity in plaintiff's left femoral head had occurred by August 28, 1970. The defendant's medical expert testified that appropriate diagnosis and treatment of plaintiff on August 28, 1970, might possibly have substantially decreased or totally prevented the deformity in plaintiff's left femoral head, (Deposition of Dr. Klinghoffer, pp. 43, 44–45, 49–50).

Plaintiff's experts, Dr. Krause and Dr. Beller, similarly testified that in reasonable medical probability proper diagnosis and treatment of plaintiff's condition even as late as August 28, 1970, would have lessened or prevented the deformity in plaintiff's left femoral head.

 Where the testimony thus establishes at the very least such possibility, if indeed not a probability, that the full damage to plaintiff's left femoral head had not yet occurred as of plaintiff's August 28, 1970, examination and diagnosis, we believe the defendant may not escape legal responsibility for plaintiff's ultimate damage. In Hicks v. United States, 368 F.2d 626 (4th Cir. 1966), the Court of Appeals rejected an argument similar to that

put forth by defendant in this case, and held that the plaintiff need not show to a certainty that the negligence of the defendant caused the injury in question. It is enough, the Court said, if the plaintiff shows a substantial possibility of avoiding the ultimate harm, and that the negligence complained of eliminated this possibility, for as the Court said, rarely is it possible to show with absolute certainty what would have happened under circumstances the wrongdoer did not allow to come to pass. 368 F.2d at 632. See also Rewis v. United States, 369 F.2d 595, 603 (5th Cir. 1966), and Hamil v. Bashline, 224 Pa. Super. 407, 412, 414–415, 417, 307 A.2d 57 (1973).

We find no indication that the law of either California or Puerto Rico would reject this principle, and we adopt it in this case.

28. Defendant United States of America is thus liable to plaintiff for $75,539.50 in lost earnings to date, $188,108.50 in future lost earnings, and $25,000 for past, present, and future pain and suffering.