Caster WOOD

v.

UNITED STATES of America.

Civ. A. No. 77–0338–R.

United States District Court,
E. D. Virginia,
Richmond Division.

July 11, 1980.

Alan W. Clarke, Lively, Va., James A. Eichner, Boyd F. Collier, Richmond, Va., for plaintiff.

Elliott Norman, Asst. U. S. Atty., Richmond, Va., for defendant.

## MEMORANDUM

WARRINER, District Judge.

In an order entered in this case on 8 March 1978, the Court noted that:

> the United States denies that the public health physician, Dr. Beatley, who treated the plaintiff in this case, was its agent for purposes of treating the plaintiff. The United States takes no position as to whether or not Dr. Beatley was negligent in such treatment. If it be shown by appropriate proof that Dr. Beatley was negligent, then the United States will defend this action only on the ground that he was not their agent for purposes of such medical treatment of plaintiff. The determination of whether or not the treating physician was the agent of the United States will be bifurcated from the trial. . . .

A schedule for the submission to the Court of stipulations and briefs on the agency issue was established by order of 15 October 1979, as modified by the orders of 6 November 1979 and 29 April 1980; that schedule is now complete and the issue of the defendant United States's agency is ripe for determination. By order of 21 December 1979

the plaintiff's action was dismissed without prejudice as to Standard Products Company, Inc. and Dr. Beatley.

Section 2674 of Title 28 of the United States Code establishes that:

The United States shall be liable, respecting the provisions of this title relating to tort claims, in the same manner and to the same extent as a private individual under like circumstances . . . .

28 U.S.C. § 2674.

Section 1346 of Title 28 of the United States Code provides that:

[T]he district courts . . . shall have exclusive jurisdiction of civil actions on claims against the United States, for money damages . . . for injury or loss of property, or personal injury or death caused by the negligent or wrongful act or omission of any employee of the government while acting within the scope of his office of employment, under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred.

28 U.S.C. § 1346(b).

Section 2671 of Title 28 of the United States Code defines "employee of the government" to include:

officers or employees of any federal agency, member of the military or naval forces of the United States, and persons acting on behalf of a federal agency in an official capacity, temporarily or permanently in the service of the United States, whether with or without compensation.

28 U.S.C. § 2671. Also defined by this section are "federal agency" and "acting within the scope of his office or employment":

As used in this chapter [28 U.S.C. §§ 2671 et seq.] and sections 1346(b) and 2401(b) of this title [28 U.S.C. §§ 1346(b) and 2401(b)] the term 'Federal agency' includes the executive departments, the military departments, independent establishments of the United States, and corporations primarily acting as instrumentalities or agencies of the United States but does not include any contractor with the United States.

In this case plaintiff asserts that Dr. Beatley was an employee of the U.S. Public Health Service under the Department of Health, Education, and Welfare, and that Dr. Beatley was acting on behalf of that federal agency in his official capacity at the time of the events forming the basis of plaintiff's claims. Defendant United States contends that Dr. Beatley was an employee of the Reedville Medical Clinic, Inc., an independent contractor with the United States, and thus that Dr. Beatley was not an employee or agent of the United States so as to require the United States to respond to damages under the Federal Tort Claims Act.

The parties have entered into extensive stipulations which the Court accepts as established facts for the purpose of this case. A summary of the relevant stipulations outlines the basic facts of this case.

### I

The plaintiff, Caster Wood, was a fisherman employed by the Standard Products Company aboard its menhaden fishing vessel *Frances*. While the plaintiff was assigned to the *Frances*, a fishbone became stuck in his left third finger. On 15 September 1976, after obtaining execution of the proper Public Health forms by the captain of the *Frances*, plaintiff's immediate supervisor, plaintiff was treated for the infected finger by Dr. Robert E. Beatley of Reedville, Virginia. Plaintiff was subsequently treated by Dr. Beatley at Dr. Beatley's office on four or five more occasions. On or about 25 September plaintiff was referred by Dr. Beatley to Dr. Robert Crouch and was hospitalized by Dr. Crouch at St. Luke's Hospital near Richmond, Virginia. At the hospital it was determined that in addition to the infection plaintiff had diabetes mellitus. Plaintiff's infected finger was amputated by a physician at St. Luke's Hospital and two days later a midforearm amputation was performed because of the continued spread of the infection.

Plaintiff was discharged from St. Luke's Hospital in mid-October 1976. Thereafter plaintiff returned to St. Luke's Hospital where he was fitted with a prosthesis for his amputated left arm.

At the time of plaintiff's injury, consultation, and treatment he was a fisherman eligible for medical care provided by the U.S. Public Health Service (hereinafter referred to as PHS) to seamen beneficiaries. In order to be eligible for PHS treatment, a beneficiary must present a properly executed Master's Certificate of Service, Form PHS–125, or other appropriate evidence that he has been employed on a registered, licensed vessel of the United States. The plaintiff presented such Master's Certificate of Service to Dr. Beatley at the time of his first treatment by Dr. Beatley on 15 September 1976. The plaintiff had initially obtained the certificate form from Dr. Beatley who had received it from the PHS hospital in Norfolk, Virginia.

At the time of the operative facts of the case at bar, Dr. Beatley was the sole physician employee of the Reedville Medical Clinic, Inc., a closely-held corporation of which Dr. Beatley and his wife were the sole shareholders and directors. The Reedville Medical Clinic, Inc. (hereinafter RMC), at this time was under contract on a "fee-for-services" basis to the PHS to serve as a PHS "contract physician" rendering specified services to PHS beneficiaries on an "as needed" basis. During the relevant period the RMC derived approximately 20 percent of its gross income from the treatment of PHS beneficiaries. Compensation from the PHS for medical treatment of PHS beneficiaries was not made directly to Dr. Beatley, rather such reimbursement was paid directly to the corporation, RMC.

The responsibilities of the PHS "contract physician" are set forth generally in 42 C.F.R. §§ 31, 32, and more specifically in the *Contract Physician's Guide*, a manual prepared by the PHS and incorporated in the contract between the PHS and the designated physician by the provisions of the contract for medical services. The terms of the contract between the RMC and PHS

and the provisions of §§ 31 and 32 of Title 42 of the Code of Federal Regulations and the Contract Physician's Guide will be examined in greater detail *infra*.

The PHS does not directly restrict a designated physician's treatment of private patients. The only restriction which the PHS actually places upon the designated physician's treatment of PHS beneficiaries is to require that the beneficiaries meet the relevant PHS eligibility requirements. The compensation received for treatment of PHS beneficiaries is determined according to a fee schedule submitted to the PHS by the designated physician. The fee schedule submitted by Dr. Beatley for PHS charges is the same fee schedule used by him for the treatment of private patients with the exception of charges made for office visits. Dr. Beatley does not have special PHS hours; PHS beneficiaries may seek and receive treatment by him during normal business hours or at other hours in the case of an emergency. The PHS does not control the day-to-day professional medical decisions of Dr. Beatley's practice.

## II

■ Before delving further into the nature of Dr. Beatley's relationship with PHS, it is advisable that the legal effect of the interposition of RMC, Reedville Medical Clinic, Inc., be more closely examined.

That the instant PHS contract was technically between the PHS and the RMC, a closely-held professional corporation, does not distort the status of Dr. Beatley as the PHS "designated physician" in his treatment of PHS beneficiaries at the RMC. At the time of the events pertinent to this case, Dr. Beatley was the sole physician employed by the RMC; on the face of Contract No. HSA 254–79–025, the contract purportedly entered into between the RMC and the PHS, Dr. Beatley executed the contract as the "contractor," and certified as to the "contractor's qualifications" by attaching a copy of his own *curriculum vitae* outlining his own professional qualifications. Further, the PHS considered Dr. Beatley and not the RMC to be the "con-

tract physician"; Appendix at Ch. A–I(a) to the *Contract Physician's Guide* lists Dr. Beatley as the "contract physician" for Reedville, Virginia, as of 13 April 1977. The Court must conclude that Dr. Beatley was the "designated physician" recognized by the PHS as the person through whom the PHS would perform professional services for appropriate PHS beneficiaries. RMC, not being a physician, could be neither a contract nor a designated physician.

As an additional preliminary matter, the Court considers the use of the terms "contract physician" and "designated physician" worthy of consideration. The Code of Federal Regulations defines "designated physician" as "a physician holding an appointment to act regularly for the [Public Health] Service for a class or classes of specified beneficiaries at a place where there is no medical relief station." 42 C.F.R. § 31.1(i) (1979). The PHS contract for professional services describes Dr. Beatley as a PHS "contract physician"; the Special Provisions of Contract No. HSA 254–79–025, Article I, # A, directs the PHS "contract physician" to the *Contract Physician's Guide* for the special details of his various professional and administrative responsibilities. The *Contract Physician's Guide*, prior to 1969, was entitled *Designated Physician's Guide*. *See Transmittal Letter No. 1 to Contract Physician's Guide* (April 1, 1969). The Transmittal Letter of 1 April 1969 provided, in pertinent part, as follows:

1. The categories of stations known as PHS Outpatient Offices and Designated Physician's Offices are discontinued and all of these are re-designated Contract Physician's Offices.

2. The new category of facilities designated as Contract Physician's Offices, will serve all beneficiaries previously eligible for care at PHS Outpatient Offices.

The discontinuance by the PHS of the use of the term "designated physician" did not repeal sections 31 and 32 of Title 42 of the Code of Federal Regulations. Rather, the Court considers that the change is an indicia that the PHS recognized its need for protective coloration for the physicians designated in specific areas to discharge its congressionally mandated health service function.

Despite the use of "contract" language, the only change wrought was that of nomenclature; a change of form rather than of substance. 42 C.F.R. § 31.1(i), wholly unamended, still recognizes the true nature of Dr. Beatley's medical service, that of a physician "*holding an appointment to act regularly for the [Public Health] Service . . . where there is no regular station.*" 42 C.F.R. § 31.1(i) (1979) (emphasis supplied). Accordingly, Dr. Beatley is described correctly as a designated physician; subsequent use by the Court of the phrase "contract physician" will only be in the context of specific reference by the instant contract, the *Contract Physician's Guide*, or the Code of Federal Regulations.

### III

An examination of the statutory and regulatory bases for the provision of medical services should be assayed.

The treatment of a PHS beneficiary, such as the plaintiff in this case, is authorized by 42 U.S.C. § 249(a)(1). *See also* 42 C.F.R. § 32.6(a)(1) (1979). Section 249 provides, in pertinent part, as follows:

The following persons shall be entitled, in accordance with regulations, to medical . . . treatment and hospitalization without charge *at hospitals and other stations of the [Public Health] Service* :

(1) Seamen employed on vessels of the United States registered, enrolled, and licensed under the maritime laws thereof, other than canal boats engaged in the coastal trade . . . ..

42 U.S.C. § 249(a)(1) (emphasis added).

42 U.S.C. § 249(e) provides that seamen otherwise entitled to medical treatment "at . . . stations of the Service" under § 249(a)(1) may receive such treatment "at the expense of the [Public Health] Service from . . . private medical . . . facilities other than those of the Service, when authorized by the officer in charge of

the station at which the application is made." 42 U.S.C. § 249(e). It can be seen then that § 249(e) affords no authority for naming "contract physicians" or "designated physicians." Under either title, the treatment of a PHS beneficiary by a designated physician, or "contract physician," is not dependent upon the authorization of any PHS officer other than the designated physician himself. Indeed, the designated physician operates a Public Health "service facility," and he is also an "authorizing official" himself, imbued with specific discretionary authority.

The regulation defines "designated physician" as a "physician holding an appointment to act regularly for the [Public Health] Service for a class or classes of specified beneficiaries at a place where there is no medical relief station." 42 C.F.R. § 31.1(i) (1979). Likewise, § 31.4(a), by reasonable implication, includes the designated physician within the category of Public Health "service facility." 42 C.F.R. § 31.4(a) (1979). Similarly, § 31.4(c) lumps designated physicians into the category of "another . . . Federal facility"—as is true again in § 31.4(d). *See* 42 C.F.R. § 31.4(c), (d) (1979). Section 31.12 indicates that designated physicians are considered Public Health "service facilities," as does § 31.13(a), (b), and (c). 42 C.F.R. §§ 31.12–13 (1979).

Seamen are entitled to medical treatment "at medical care facilities operated by the [Public Health] Service or, in accordance with these regulations, at [Public Health] Service contract medical facilities at the expense of the [Public Health] Service." 42 C.F.R. § 32.11(a) (1979). Section 32.11(b) states that "[w]here medical facilities of the [Public Health] Service are not available, medical care and services may be obtained from contract medical providers *designated* by the [Public Health] Service." 42 C.F.R. § 32.11(b) (1979) (emphasis supplied).

If "local [Public Health] Service operated facilit[ies]" are unavailable then non-Service medical care will be provided "at the expense of the Service" through arrangements "made by an authorizing official."

It is clear from this reference that the designated physician provides not non-service care but, instead a "service operated facility." 42 C.F.R. § 32.12(a) (1979).

Designated physicians are charged with the responsibility of determining an applicant's status as a PHS beneficiary prior to treatment as a beneficiary. *Contract Physician's Guide*, Ch. B–1, § 2.1.2 (Apr. 1, 1969). Since medical treatment of a PHS beneficiary by a designated physician does not require arrangements to be made by "an authorizing official" other than the designated physician himself, the inference clearly is that a designated physician is included within the category "local Service operated facility." 42 C.F.R. § 32.12 (1979).

This is consistent with § 32.14(a) which provides that a PHS beneficiary present a Master's Certificate or other evidence of eligibility "at the medical care facility of the [Public Health] Service where application is made." 42 C.F.R. § 32.14 (1979). Since § 32.14 apparently is the authority for the filing of such a certificate by the PHS beneficiary with a designated physican this again assumes that a designated physician is a Service medical facility. The designated physician is the "authorizing official" accepting the PHS beneficiary's application. The designated physician's office is thus, arguably, a "fourth-class station." *See* 42 C.F.R. § 31.1(h) (1979). In any event, it is clear that a designated physician is not performing services as a private medical facility pursuant to 42 U.S.C. § 249(e) since he is not performing medical treatment for an applicant pursuant to the authorization from any "officer in charge of the station at which the application is made" other than himself.

The duties of the "authorizing official" include receiving the applications of PHS beneficiaries for medical treatment, 42 C.F.R. § 32.13; the determination of eligibility of an applicant, 42 C.F.R. §§ 32.14, 32.18; and the authorization of emergency "medical, surgical, and dental treatment or hospitalization," 42 C.F.R. § 32.12. All of these things a designated physician does.

41 U.S.C. § 252(c)(4) is cited on the contract as providing the statutory authority for the negotiation of the contract between PHS and "contract physicians." This statute, however, does not authorize the delegation by PHS through contract or otherwise of its responsibility for providing medical treatment to PHS beneficiaries.[1] Indeed, no specific statutory authority appears to exist for a contractual discharge of the public health duties of PHS.

### IV

The statutory and regulatory status of the designated physician is significantly different from the statutory and regulatory status of the employees of the Neuces County jail present in *Logue v. United States*, 412 U.S. 521, 93 S.Ct. 2215, 37 L.Ed.2d 121 (1973).

In *Logue* the Supreme Court concurred with several federal courts of appeal in concluding that 28 U.S.C. § 2671 [2] "adopts the traditional distinction between employees of the principal and employees of an independent contractor with the principal," and that "the critical factor in making this determination is the authority of the principal to control the detailed physical performance of the contractor." 412 U.S. at 527–28, 93 S.Ct. at 2219. In *Logue* the Court held that "employees of a county jail that housed federal prisoners pursuant to a contract with the Federal Bureau of Prisons were not federal employees or employees of a federal agency; thus, the United States was not liable for their torts. Although the contract [in *Logue*] required the county jail to comply with the Bureau of Prisons' rules and regulations prescribing standards of treatment, and although the United States

reserved rights of inspection to enter the jail to determine its compliance with the contract, the contract did not authorize the United States to physically supervise the jail's employees." *United States v. Orleans*, 425 U.S. 807, 814–15, 96 S.Ct. 1971, 1976, 48 L.Ed.2d 390 (1976).

In *Logue* the Sheriff of Neuces County, housing federal prisoners under contract with the Federal Bureau of Prisons, was not merely fulfilling the function of the Bureau of Prisons; rather, he was acting under a contract entered into by direct authority of Congress pursuant to 18 U.S.C. § 4002.[3] 412 U.S. at 528–29, 93 S.Ct. at 2219–2220. The petitioners in *Logue* suggested that the Bureau of Prisons had a duty under 18 U.S.C. § 4042 to provide for the care and safekeeping of prisoners and thus that the Neuces County employees "who were discharging the Government's obligation by contract should be held to be employees of the Government for purposes of liability under the [Federal Tort Claims] Act." 412 U.S. at 528, 93 S.Ct. at 2220. The Court noted that "Congress [in 18 U.S.C. § 4002] . . . clearly contemplated that the day-to-day operations of the contractor's facilities were to be in the hands of the contractor, with the Government's role limited to the payment of sufficiently high rates to induce the contractor to do a good job." 412 U.S. at 529, 93 S.Ct. at 2220. The contract in *Logue* did not authorize the United States to supervise or control the day-to-day conduct of the county jail employees. Accordingly, these employees were held to be employees of an independent contractor, thus obviating the potential liability of the United States under the Federal Tort Claims Act.[4]

---

1. *See Logue v. United States*, 412 U.S. 521, 528–29, 93 S.Ct. 2215, 2219–2220, 37 L.Ed.2d 121 (1973) and discussion *infra*.

2. The statute, in pertinent parts, is quoted at p. 793, *supra*.

3. No authority to contract similar to that given by Congress to the Bureau of Prisons in *Logue* has been given to the PHS. The Court considers this a significant but not a controlling distinction. In each case the "critical factor" remains the degree of control retained and ex-

ercised over "the detailed physical performance of the contractor." *Logue, supra* at 527–28, 93 S.Ct. at 2219.

4. In *Logue*, the Neuces jail was not designated as a federal detention facility. The sheriff simply contracted space and services to the federal authorities incident to his primary function of holding State and local prisoners. Dr. Beatley, on the other hand, was functioning as the PHS designated physician in Reedville, Virginia.

*United States v. Orleans, supra,* teaches that "the question . . . is not whether the . . . [alleged federal tortfeasor] receives federal money and must comply with federal standards and regulations, but whether its day-to-day operations are supervised by the Federal Government." 425 U.S. at 815, 96 S.Ct. at 1976. The Court in *Orleans* distinguished independent contractors from federal employees or agents.

> Billions of dollars of federal money are spent each year on projects performed by people in institutions which contract with the Government. These [independent] contractors act for and are paid by the United States. They are responsible to the United States for compliance with the specifications of a contract or grant, but they are largely free to select the means of its implementation. . . . [B]y contract, the Government may fix specific and precise conditions to implement federal objectives. Although such regulations are aimed at assuring compliance with goals, the regulations do not convert the acts of entrepreneurs—or of state governmental bodies—into federal governmental acts.
>
> Federal funding reaches myriad areas of activities of local and state governments and activities in the private sector as well. It is inconceivable that Congress intended to have a waiver of sovereign immunity follow congressional largesse and cover countless unidentifiable classes of 'beneficiaries.' The Federal Government in no sense controls 'the detailed physical performance' of all the programs and projects it finances by gifts, grants, contracts, or loans. The underlying statute emphasizes that a community action agency is a local, not a federal, enterprise; thus agents and employees of a local community agency are not 'employee[s] of the [Federal] government.'

425 U.S. at 815–16, 96 S.Ct. at 1976–77 (citations and footnotes omitted).

In *Orleans* the Court was presented with a "community action agency" staffed by persons in the community. The agency received conditional federal monies to help carry out community betterment. The federal regulations and guidelines, though extremely detailed and obtrusive, did not give the supervising agency, the Office of Economic Opportunity, the authority to supervise the day-to-day work of the program employees. Federal oversight was there limited to the assurance "that federal funds not be diverted to unauthorized purposes." 425 U.S. at 818, 96 S.Ct. at 1977. A unanimous Court ruled, accordingly, that the community action agency was not a federal instrumentality or agency and that its employees were not employees of the federal government for purposes of the Federal Tort Claims Act. 425 U.S. at 819, 96 S.Ct. at 1978.

*Logue* and *Orleans* are the lodestars for determining this case. Both decisions emphasize that the degree of control exercised and able to be exercised by the federal government is the "critical factor" in determining whether one is an employee or agent of the United States, and thus whether the United States ultimately may be liable in damages under the FTCA. The more control exercised or able to be exercised by the government, the greater the likelihood of the existence of an agency. The obverse is equally true. The less control or supervision exercised or able to be exercised, the less likely that an agency relationship exists. These principles derive from common law concepts long recognized and established. *See generally* Restatement (Second) of Agency § 2 (1958).

The parties to this law suit have stipulated that the PHS *does not* exercise control over or dictate the day-to-day medical judgment of Dr. Beatley in his provision of medical services to eligible PHS beneficiaries. This stipulation, in light of *Logue* and *Orleans,* would appear dispositive of the issue before the Court. The Court, however, is not so persuaded. The PHS does not and cannot exercise control over the professional judgment of any PHS physician, whether that physician be termed designated, part-time, full-time, uniformed or civilian. No physician can permit himself to be controlled by an outside agency in the

professional medical treatment of a patient.[5]

Precisely because a physician, properly serving his patient, like a lawyer, properly serving his client, is not subject to external control in the exercise of his professional judgment, the Court must focus its analysis upon those areas of medical service that may be supervised and controlled. More specifically, in the context of this suit, the Court must consider whether the federal government, through the PHS, retained and exercised significant authority over the non-treatment areas of Dr. Beatley's activities on behalf of PHS. The analysis that follows is directed at that question.

### A.

42 C.F.R. § 31.1(i) establishes that the designated physician, Dr. Beatley, held an appointment to act regularly for the PHS. 42 C.F.R. § 32.11(b) refers apparently to the same designated physician when it describes the "contract medical providers designated by the [Public Health] Service." 42 C.F.R. § 32.11(b) (1979). When § 32.11(b) is read with § 31.1(i), the insertion of the word "contract," which the Court considers to have been an artful attempt to avoid liability under the Federal Tort Claims Act, takes nothing away from § 31.1(i). The designation and appointment of the designated physician to act for the PHS are simply memorialized by a contract.

The contract between the PHS and RMC, in which Dr. Beatley figures as the designated physician, incorporates the provisions of the *Contract Physician's Guide* (hereinafter *Guide*) as the primary source of information and direction as to the designated physician's responsibilities and duties. This *Guide* is updated periodically to modify or enlarge these responsibilities and duties. It is instructive to consider certain of the provisions in the *Guide* to ascertain the nature of the relationship between Dr. Beatley and the PHS.

1. The *Guide* at Ch. A–1, § 1.2.1, notes that the physician has "official duties." This is a phrase of employment not contract.

2. The *Guide* at Ch. A–1 § 1.2.4, notes that when a physician is treating certain paying patients he "is acting in his private capacity, and not on an official basis."[6] This distinction between private and official capacities is repeated as a "Note" on Attachments A–1–1, § 1.2a of the *Guide*.

3. That the physician's office is a "station" of some class or description is indicated in the *Guide* at Ch. A–1, § 2.1.1, where it is noted that seamen, in order to obtain medical service "must appear . . . at the station. . . ." At. Ch. A–1, § 2.1.2, the Guide notes that "the station may accept" proof of his eligibility and at Ch. A–1, § 2.1.4, the designated physician is referred to as "the officer to whom application for medical service is made. . . ." Indeed, this language reinforces the Court's conclusion that not only is the designated physician not an independent contractor but he is rather an authorizing PHS officer or official. *See* 42 U.S.C. § 249(e); 42 C.F.R. § 32.12 (1979). At Ch. A–1, § 2.1.5 of the *Guide* the designated physician is directed to file all evidentiary documents presented as evidence for medical treatment "with the station's application file." It is clear from the context that the station referred to is the designated physician's office.

4. Chapter A–1, § 2.1a of the *Guide* is a reproduction of PHS Form-125. This form directs a seaman seeking medical attention to the "nearest U.S. Public Health Service Hospital or Public Health Service medical care station." No mention is made of a "contract physician" yet the *Guide* provides that the seaman must present the form to a designated physician to obtain from such physician the medical attention he seeks. *See Contract Physician's Guide* at Ch. A–1

---

5. To permit such intervention would lead ineluctably to the infamous Soviet "psychiatric hospitals" where so-called physicians are controlled by the communist government in their "treatment" of patients.

6. Compare this directive with that made to part-time U. S. Magistrates. 28 U.S.C. § 632 (b). No one would suggest a magistrate is a contract provider of services.

§ 2.1.1.2 (1969). As noted above, the designated physician is thus subsumed within the designation to act as a "Public Health Service medical care station."

Form PHS–125 further directs the seaman to locate the designated physician in a local telephone directory under "U.S. Government." This, as well as the "station" designation, is consistent with the language of the contract, which provides:

[The Contract Physician's] office will constitute a PHS contract medical care facility for the medical care of eligible PHS beneficiaries and will be so listed in the local telephone directory.

*Contract No. HSA 254–79–025, Article I, ¶ A* (dated Sept. 28, 1978). The *Guide* also specifically provides that the designated physician should list his medical care facility "in the telephone directory under U.S. Government, Department of Health, Education, and Welfare, Public Health Service Contract Physician's Office." Ch. B–1, § 1.1.2.

The seaman beneficiary seeking medical attention at a PHS station is further told in capital letters on PHS Form-125 that the form authorizes no medical care "BY ANY PRIVATE AGENCY." This warning is supportive of the conclusion that a designated physician is not a private agency under contract with the federal government, but rather is a public agency providing PHS medical treatment for designated beneficiaries. The *Guide* again describes the designated physician's office as a "station" when it warns that a discharge from one Service facility "shall not be accepted by *another* station as sufficient evidence of eligibility. . . ." Ch. A–1, § 2.2.5. Such a warning to a designated physician would be unnecessary if his office were not considered to be a "station" of the PHS.

5. The *Guide*, at Ch. A–1, § 3.2.1, indicates that medical treatment by a designated physician is not a contractually delegated authority to the physician to provide medical treatment *for* the Service, but is instead the actual provision of "medical care or treatment *by* the Service. . . ."

6. The *Guide* at Ch. A–1, § 2.4.1, refers to the designated physician's office as a Public Health "Service station" and further indicates that the designated physician is an "authorizing official" within the meaning of 42 U.S.C. § 249(e). Chapter A–1, § 2.4.1, provides that "the Contract Physician may authorize necessary hospitalization and treatment in private or public facilities, at the expense of the [Public Health] Service" in cases of emergency medical care treatment. If the designated physician is the authorizing official, perforce he must first be an official and he cannot be a private medical doctor under contract with the PHS. *See also Contract Physician's Guide* at Ch. A–1, § 2.4.5; Ch. A–2, § 1.1.6.

7. The *Guide*, at Ch. A–2, § 5.1.1, requires the designated physician to maintain records "adequate for continued care of the patient" as well as for various administrative purposes. The *Guide*, at Ch. A–2, § 4.1.2, states that the medical records of PHS beneficiaries required to be kept by the designated physician are "records of the Public Health Service." The *Guide*, at Ch. A–2, § 5.1.3, gives to appropriate PHS officials supervisory authority over designated physicians to "insure" that the designated physician's records are adequate to meet patient needs as well as administrative needs; when the designation of the physician is ended ("contract terminated"), the patient's medical records are to be removed from the treating physician (the designated physician) and turned over to a successor designated physician or stored in a Federal Records Center.

8. The *Guide*, at Ch. A–2, § 5.1.4, notes that because of their function as PHS designated physicians, under the Privacy Act of 1974 designated physicians, "are considered officers and employees of the government" for purposes of civil and criminal penalties for their failure to comply with the provisions of the Act. 5 U.S.C. § 552a(m) is instructive on this point; it provides, in pertinent part, as follows:

When an agency provides by contract for the operation by or on behalf of the agency of a system of records to accomplish an

agency function, the agency shall . . cause the requirements of this section to be applied to such system. For purposes of . . . [criminal penalties set forth in 5 U.S.C. § 552a(i)] . . . any such contractor and any such employee of such contractor . . . shall be considered to be an employee of an agency.

5 U.S.C. § 552a(m). This provision supports the Court's conclusion that Dr. Beatley acts on behalf of the PHS in his administrative functions connected with and closely intertwined with his care and treatment of PHS beneficiaries as a PHS designated physician. It is also noteworthy that under this same section the patient's access to his own record in the designated physician's office is through the "supervising" PHS Hospital.

9. The *Guide*, at Ch. A–2, § 5.1.5(e)(i), permits the disclosure of a PHS beneficiary patient's record in the PHS designated physician's possession to the Department of Justice when claims are asserted against the United States for particular medical conditions which are "alleged to have arisen because of activities of the Public Health Service in connection with that individual."

10. The *Guide*, at Ch. A–2, § 5.1.6, requires that a Freedom Of Information Act (FOIA) bulletin be given to each PHS patient by the designated physician, thus emphasizing that the medical record generated by the visit to the designated physician is a federal medical record.

11. The *Guide*, at Ch. A–2, § 5.2.1, points out subtly, but clearly, that the designated physician's PHS beneficiary patients are in fact "patients of the Public Health Service."

12. The *Guide*, at Ch. A–2, § 6.1.1–.2, cites 42 U.S.C. § 248(e) and 42 U.S.C. § 203 as authority for the designated physician to authorize the payment of "burial expenses for any patient dying in a hospital or station." The necessary inference of course, is that the designated physician's office is a PHS station.

13. The *Guide*, at Ch. A–2, § 6.1.2, cites authority for the delegation to the "contract physician" of the responsibility to "determine the extent to which funds . . .

are not available for burial expenses for any patient dying in a . . . station and to provide for payment to that extent." This delegation of responsibility is said to be derived from "Section 202 of the PHS Act. . . . " That Section is codified as 42 U.S.C. § 203. No authority to delegate to an independent contractor is contained in § 203.

14. 42 C.F.R. § 32.1(f) defines "authorizing official" as "Service officers or employees duly designated by the Director, Division of Hospitals and Clinics to authorize and provide care and treatment to beneficiaries at [Public Health] Service expense." 42 C.F.R. § 32.1(f) (1979). Since it is manifest that a designated physician is an "authorizing official" it is implicit in that definition that he is a "Service [officer] officer or . . . [employee]" and not an independent contractor.

15. The *Guide*, at Ch. B–1, § 1.1.1, speaks of the designated physician's "assuming charge" of the facility, a term of appointment, not of contract.

16. The *Guide*, at Ch. B–1, § 1.1.2, requires that the listing in the telephone directory under United States Government be at the expense of the United States Government. This section contemplates a separate telephone for the physician's private practice.

17. The Ch. B–1, § 1.1.3, the *Guide* mentions "[j]urisdictional offices" over the designated physician. Again, it must be noted, these are words of appointment to office, not of contract for work.

18. The *Guide*, at Ch. B–1, § 3.1.1, purports to define a "Contract Physician" as being "under contract on a fee for services basis;" yet Ch. B–1, § 3.1.2 mentions the necessity that the designated physician "resign or terminate his contract." While "termination of contract" is classic contract language, "resign" surely is not.

19. The *Guide*, at Ch. B–1, § 3.1.4, differentiates between a PHS designated physician's "private practice" and his "official duties." This subsection requires him to treat all beneficiaries of the PHS who

present themselves during office hours and, after office hours, all PHS beneficiaries who require emergency treatment. Again, "official duties" implies appointment to service, not a contract for work.

20. The *Guide*, at Ch. B–2, § 1.2.1, provides for securing stationery and the blank forms "necessary to the transaction of official business" and directs the designated physician to secure such supplies from his "jurisdictional" office "as soon as possible after assuming charge" of his office. Appointment to office adheres in these phrases.

21. The *Guide*, at Ch. B–4, § 1.2.1, requires patient records to be kept by the designated physician in an "accessible manner" and Ch. B–4, § 1.2.2 prescribes the information which "must be" included in the retained records. (Apparently Ch. B–4, § 2.1 is identical to Ch. B–4, § 1.2.1 except that § 2.1 contains a pronoun reference to "his/her" rather that to the traditional "his" in a genderless sense; § 2.1 was promulgated on 15 April 1977, while § 1.2 was promulgated on 1 April 1969.)

22. The *Guide*, at Ch. B–4, § 2.2.1, requires that clinical records be maintained "in a manner to facilitate ready reference" and Ch. B–4, § 2.2.2 requires official correspondence be maintained in "orderly files." The *Guide* at Ch. B–4, § 2.2.3 requires blank forms and stationery be "neatly stocked" and directs reordering of the same "before the stock is completely depleted."

23. Periods for the retention of records are provided in Ch. B–4, § 2.2.4.

24. The change in terminology for PHS Outpatient Offices from "Designated Physician's Offices" to "contract Physician's Offices" was effected by Transmittal Letter 1, dated 1 April 1969, and was explained therein as simply a "re-designat[ion]." The Transmittal Letter gave no reason for such a change in terminology and, for all it appears, the change in terminology was simply a change of name without a change in function. This conclusion is supported by the body of the Transmittal Letter, wherein it is stated that the "new category of facilities, designated as Contract Physician's Offices will serve all beneficiaries previously eligible for care at PHS Outpatient Offices."

## B.

■ In light of the pervasive administrative control retained and exercised by the Public Health Service over the performance of Dr. Beatley as a designated physician, far beyond the simple enforcement of a contractual obligation, and in light of the manifest nature of the appointment as to an official post of duty, coupled with the transparent substitution of contract language, the Court concludes that Dr. Beatley, in his capacity as a designated physician, was an employee or official of the Public Health Service. *United States v. Orleans, supra,* 425 U.S. at 813–19, 96 S.Ct. at 1975–1978; *Logue v. United States, supra,* 412 U.S. at 527–33, 93 S.Ct. at 2219–2222; 28 U.S.C. §§ 2671 *et seq.*

Further, the Court concludes that in his capacity as a designated physician, Dr. Beatley functionally discharged the medical care responsibilities of the Public Health Service in Reedville, Virginia, and was therefore "acting on behalf of . . . [the Public Health Service, then subsumed under the aegis of the Department of Health, Education and Welfare,] in an official capacity . . . ." 28 U.S.C. § 2671. Thus, even assuming under the facts presented in the stipulations and exhibits that Dr. Beatley was not an employee of the Public Health Service, an assumption at odds with the clear import of these facts, Dr. Beatley acted "on behalf of" and in fact was held out by the Public Health Service as representing the then Department of Health, Education and Welfare at the time of his treatment of the plaintiff giving rise to the present claim for relief. *Witt v. United States,* 462 F.2d 1261, 1263–65 (2d Cir. 1972).[7]

---

7. The United States argued that despite all appearances, Dr. Beatley was simply a busy phy-

sician treating PHS beneficiaries as a sideline and being paid for his services in a manner

When a full-time PHS physician, employed at a PHS hospital, negligently treats a PHS beneficiary which proximately causes injury to the beneficiary, the United States is held responsible in tort for the wrongful conduct of its agent or employee. *Penn Tanker Co. v. United States*, 409 F.2d 514, 520 (2d Cir. 1969), *on remand*, 310 F.Supp. 613, 615–18 (S.D.Tex.1970); 28 U.S.C. §§ 2671 *et seq.*. In this case, Dr. Beatley, as a part-time PHS designated physician was held out to the public in general and to PHS beneficiaries in particular by the Public Health Service as a PHS designated physician empowered to act on behalf of the Service in the provision of medical treatment to PHS beneficiaries. Dr. Beatley was listed as a PHS designated physician under the heading of "United States Government" in the public telephone directory; Dr. Beatley was held up to potential PHS beneficiaries upon Form PHS–125, utilized for application to the designated physician for medical treatment, as a non-private, hence public, here federal, physician, appropriately authorized to dispense public medical treatment over and care for PHS beneficiaries unable to seek treatment at larger Service facilities. The Court discerns no statutory authority for the delegation to private physicians as independent contractors of this important public responsibility by the Public Health Service. *See Logue v. United States, supra*, 412 U.S. at 528–30, 93 S.Ct. at 2219–2220. Accordingly, the Court concludes that Dr. Beatley, in fulfilling his responsibilities to the Public Health Service as a PHS designated physician, was not an independent contractor but rather was an employee or official of the United States or was their agent for purposes of this civil action. *See Rosario v. American Export-Isbrandtsen Lines, Inc.*, 395 F.Supp. 1192, 1206–08 (E.D.Pa.1975), *rev'd on other grounds*, 531 F.2d 1227 (3rd Cir.), *cert. denied*, 429 U.S. 857, 97 S.Ct. 156, 50 L.Ed.2d 135 (1976).

An appropriate order shall issue.

indistinguishable from a Blue Cross physician participant.

The fact that Dr. Beatley's contract was for part-time work merely meant that he could have private patients. It did not mean that he was authorized to turn away PHS beneficiaries because the volume of such work exceeded part-time. Further, while the percentage of Dr. Beatley's PHS income deriving from the treatment of PHS beneficiaries was not substantial, its amount was not set by the federal government. Rather, it was determined by the ebb and flow of incoming PHS beneficiary patients. Conceivably, the percentage of PHS patients comprising Dr. Beatley's practice at the RMC could be 100 percent or 1 percent without affecting his status as a designated physician. Moreover, the nature of the fees reimbursed by the PHS to Dr. Beatley is under the control of the PHS since the bills need not be honored if unreasonable.

Finally, parallels which the United States seeks to draw between the PHS and Blue Cross medical insurance coverage are illusory. Blue Cross is not a congressionally authorized health care provider performing its function through physicians. PHS is such a health care provider. In Reedville, Virginia, PHS provides that service through Dr. Beatley.