**UNITED STATES FIDELITY AND GUARANTY COMPANY, Plaintiff,**

v.

**UNITED STATES of America, Defendant.**

Civ. No. 84–1255.

United States District Court, M.D. Pennsylvania.

July 3, 1986.

As Amended July 3, 1986.

Jonathan E. Butterfield, Liebert, Short, Fitzpatrick & Lavin, Williamsport, Pa., for plaintiff.

Barbara A. Kosik, Asst. U.S. Atty., Scranton, Pa., Ray E. Spears, Office of General Counsel, U.S. E.P.A., Washington, D.C., and Phyllis Jackson Pyles, Sr. Trial Atty., Torts Branch, Civ. Div., U.S. Dept. of Justice, Washington, D.C., for defendant.

## OPINION

MUIR, District Judge.

### I. Introduction.

On September 20, 1984, the United States Fidelity & Guaranty Company (hereafter "U.S.F. & G.") filed the complaint in this action against the United States of America seeking recovery pursuant to the Federal Tort Claims Act, 28 U.S.C. § 2671, et seq. Recovery was sought for losses which occurred as a result of a release of an acid cloud on March 23, 1982 during the clean-up of a tank containing hazardous chemical waste at the site of Drake Chemicals, Inc. in Lock Haven, Pennsylvania. On February 13, 1986, an amended complaint was filed adding a claim for $5,000 of personal injury losses which occurred as a result of another release of a sulphuric acid cloud from the same tank. On February 28, 1986, the United States filed a motion to dismiss or for summary judgment based upon its assertion that the challenged acts of the Environmental Protection Agency (hereafter "EPA") fall within the discretionary function exception to the Federal Tort Claims Act, 28 U.S.C. § 2671, et seq. By opinion dated April 16, 1986, this Court denied the motion, ruling that the discretionary function exception does not apply in this case.

The case was bifurcated for trial between the issues of liability and damages and the liability phase of the case was tried to the Court from June 2 through 6, 1986. The Court's findings of fact, discussion, and conclusions of law as to liability follow.

### II. Findings of Fact.

The parties submitted undisputed findings of fact which have been adopted by

this Court. The letter "U" for "Undisputed" follows such findings.

1. Plaintiff, the United States Fidelity & Guaranty Company (hereinafter "U.S.F. & G.") is a corporation engaged in the insurance business. (U)

2. The Defendant is the United States of America, acting through its Environmental Protection Agency (hereinafter "EPA"). (U)

3. At all times material to this action, U.S.F. & G. was the insurer of OH Materials Handling Company, a division of KBI, Inc. (hereinafter referred to as "OH Materials"), pursuant to a liability insurance policy issued by U.S.F. & G. to KBI, Inc. (U)

4. OH Materials, as relevant to this litigation, is engaged in the business of containing, abating, and cleaning up hazards posed by chemical waste. (U)

5. Drake Chemicals, Inc. is a corporation which operated a chemical manufacturing facility in Lock Haven, Pennsylvania, from 1961 to August, 1981. (U)

6. In or around August, 1981, Drake Chemicals, Inc. ceased operations and filed a petition in bankruptcy. (U)

7. At the time it discontinued its operations, Drake Chemicals abandoned its manufacturing site, leaving numerous chemicals, drums, and reaction vessels at the site (hereinafter referred to as "Drake site"). (U)

8. The Pennsylvania Department of Environmental Resources (hereinafter "Department of Environmental Resources") inspected the Drake Chemicals site and determined that it posed a threat to the public health and the environment. (U)

9. On January 5, 1982, the Department of Environmental Resources ordered Drake Chemicals to clean up the Drake site. (U)

10. Drake Chemicals responded to the orders of the Department of Environmental Resources by advising that it lacked the financial resources to clean up the site. (U)

11. In February of 1982, the Department of Environmental Resources requested that EPA consider the Drake site for emergency funding of a cleanup under the Comprehensive Environmental Response, Compensation, and Liability Act of 1980 (hereinafter "the Act"), 42 U.S.C. § 9601 et seq. (U)

12. The Act is a federal program which provides authority to the federal government to clean up sites which it has determined pose an imminent threat of harm or endangerment to the public health and the environment. (U)

13. Cleanups under the Act of sites such as the Drake site are administered by EPA. (U)

14. The Act authorizes removal and remedial actions as responses to potential hazards. (U)

15. "Removal" actions under the Act are relatively short-term responses and include "immediate" and "planned" removals. (U)

16. The Drake Chemicals site was considered by EPA for an immediate removal action under the Act. (U)

17. Immediate removal actions are undertaken only if a response is needed within hours or days to prevent or mitigate significant harm to human health or the environment and such actions will not otherwise be provided on a timely basis. (U)

18. Generally, immediate removal actions cannot continue for longer than 6 months or exceed $1,000,000 in costs unless a special exception is given by the Administrator of EPA. (U)

19. EPA's participation in removal actions is controlled by an On Scene Coordinator. (U)

20. The On Scene Coordinator directs federal removal efforts financed by the Act and coordinates all other efforts at the scene of the removal activity. (U)

21. Federally funded removal actions are performed by independent contractors selected by the On Scene Coordinator from a list of contractors which EPA has determined have the resources and experience to carry out the removal. (U)

22. In February of 1982, the Department of Environmental Resources and EPA inspected the Drake site and observed over 3,000 drums, and various reactors and tanks, containing hazardous chemicals. (U)

23. Many of said drums, reactors and tanks were in a deteriorating condition. (U)

24. Previous investigations at the Drake site had revealed ground water contamination and poor air quality in the area.

25. After these investigations, the EPA, through its On Scene Coordinator, concluded that there existed at the Drake site an imminent threat of fire and explosion as well as a threat of direct public contact with hazardous chemicals, all of which constituted a severe threat to the public health. (U)

26. The City of Lock Haven, with a population of approximately 15,000, is situated immediately to the north, west, and northeast of the Drake site. (U)

27. Areas to the south, southeast, and east of the Drake site are sparsely populated.

28. The EPA's On Scene Coordinator issued oral and written demands to the owners of Drake Chemicals, Inc. to clean up the site.

29. When the owners of Drake Chemicals refused to clean up the Drake site, the On Scene Coordinator requested approval from the EPA Office of Emergency and Remedial Response to undertake an immediate removal action. (U)

30. On February 26, 1982, the On Scene Coordinator received authorization to undertake immediate removal activities at the Drake site. (U)

31. Thereafter, in conjunction with the Department of Environmental Resources, the EPA began emergency removal activities which included the removal and securing of all materials and conditions on the Drake site that could pose an imminent hazard. (U)

32. The Drake Chemicals site was one of the most hazardous sites the EPA has undertaken to clean up to this date under the Act's program.

33. An Emergency Response Team of the EPA was involved and on site during major portions of the removal activities at the Drake site. (U)

34. The Emergency Response Team provided technical and scientific assistance to the On Scene Coordinator. (U)

35. Also involved in the cleanup of the Drake site was a Technical Assistance Team which provided logistical and technical support to the EPA. (U)

36. The On Scene Coordinator utilized the Technical Assistance Team to obtain information from outside sources on chemical waste disposal methods.

37. On February 28, 1982, the EPA, through its On Scene Coordinator, signed an agreement with OH Materials captioned "Notice to Proceed with Emergency Response to Hazardous Substance Release" (hereinafter "Notice to Proceed"). (U)

38. The EPA hired OH Materials as its prime contractor at the Drake site as a result of OH Materials' expertise in chemical waste disposal techniques.

39. The Notice to Proceed is a preliminary contractual instrument which represents a time and materials contract whereby payment for contractor services is made on the basis of direct labor hours at fixed hourly rates and materials, subcontractor, and travel costs. (U)

40. Pursuant to the Notice to Proceed the On Scene Coordinator retained responsibility for determining what work would be done, the means and methods employed in disposing of waste, and the contractor's expenditures for material and manpower.

41. The Notice to Proceed provided that OH Materials was to furnish the necessary personnel, materials, services, facilities and otherwise do all things necessary for or incident to the performance of the work set forth in the "Scope of Work" contained in the Notice to Proceed.

42. The On Scene Coordinator was responsible for directing and monitoring the

activities of OH Materials at the Drake Site.

43. The duties of the On Scene Coordinator at the Drake site included:

A. Making assignments of major tasks to the various contractors on site;

B. Consulting with independent experts such as private agencies, Emergency Response Team, Pennsylvania Department of Environmental Resources and the Technical Assistance Team regarding technical solutions to the cleanup problem.

C. Approval of task execution.

D. Acceptance of task completion.

E. Cost control.

44. Dr. Joseph P. Lafornara, at the time acting chief of the Analytical Support Section, EPA Emergency Response Team, was at the Drake site on March 3 through March 5, 1982, and on March 30, 1982.

45. Andre P. Zownir, EPA Emergency Response Team environmental engineer, was at the Drake site on March 3–5, 8–12, and 17–19, 1982. (U)

46. Bruce Potoka, EPA environmental scientist, was at the Drake site on March 3–5, 8–11, and 15–20, 1982. (U)

47. Thomas Massey, EPA On Scene Coordinator, was at the Drake site on March 2–5, 8–11, and 17, 1982. (U)

48. Benton Wilmouth, EPA On Scene Coordinator, was at the Drake site on March 3–5, 9–12, and 15–24, 1982. (U)

49. Jack Downey, EPA On Scene Coordinator, was at the Drake site on March 4, 5, 8–10, 21–24, 1982. (U)

50. All actions of EPA, referenced herein, were performed by EPA employees, acting within the scope of their respective employment. (U)

51. The On Scene Coordinator assigned to the Emergency Response Team the task of preparing a site safety plan.

52. The On Scene Coordinator at the Drake site was responsible for coordination of the implementation of the site safety plan to ensure that workers and regulatory personnel conducted their operations in a safe manner.

53. One of the most serious hazards existing at the Drake site was a tank containing oleum. (U)

54. Oleum is the common name for $H_2SO_4 + SO_3$. It is concentrated sulfuric acid with the sulfate radical dissolved in it at 30–70% levels. (U)

55. Oleum is extremely reactive with a wide range of compounds and is extremely sensitive to moisture, producing a fuming reaction caused by the reaction of water and the sulfate radical. (U)

56. The oleum on the Drake site was stored in a carbon steel tank having a total capacity of approximately 5,000 gallons. (U)

57. The tank was an old railroad tank car which had its wheels removed.

58. When oleum is stored in a carbon steel tank, the sulfate radical will slowly react with the tank's side walls, producing iron sulfate salts which fall to the bottom of the tank as a sludge. (U)

59. The oleum tank was sitting on two concrete pedestals. (U)

60. The pedestals were approximately eight feet tall.

61. The oleum tank was over seven feet tall from the bottom of the tank to the top of the manway (aperture).

62. At the time of commencement of the removal activities at the Drake site the oleum tank was venting directly into the atmosphere and posed a major threat of fire, explosion or release of pollutants into the air. (U)

63. The On Site Coordinator determined that before the hazard posed by the oleum tank could be addressed, the amount of materials contained in the tank had to be assessed. (U)

64. On or before March 8, 1982, the On Scene Coordinator assigned OH Materials the task of determining the quantity of oleum contained within the oleum tank. (U)

65. OH Materials performed this task through a method known as "sticking" where a dipstick or rod is inserted into the material to determine its depth. (U)

66. Visual assessment of the contents of the oleum tank was hampered by the fumes emanating from the tank. (U)

67. Accurate assessment of the contents of the oleum tank was difficult because the tank was on pedestals.

68. OH Materials personnel reported to the On Scene Coordinator that the tank contained four inches of sludge and two inches of liquid oleum. (U)

69. It was estimated that the tank contained approximately 110 gallons of product. (U)

70. The On Scene Coordinator knew of the method employed in assessing the contents of the oleum tank.

71. The On Scene Coordinator was advised by OH Materials personnel that the tank could possibly contain sludge build-up at the ends of the tank which would mean that the actual volume of oleum in the tank was greater than the estimated volume.

72. The 110 gallons of oleum initially estimated to be contained within the tank was a sufficient quantity of oleum to produce a substantial release of acid, posing hazards to the public.

73. The On Scene Coordinator, Environmental Response Team personnel, Technical Assistance Team personnel, Department of Environmental Resources personnel, and OH Materials personnel discussed appropriate methods of disposing of the oleum. (U)

74. Thomas Massey, Dr. Joseph Lafornara, and Andre Zownir were EPA employees involved in decision making concerning methods to be employed in neutralization and disposal of the contents of the oleum tank on the Drake site. (U)

75. OH Materials personnel suggested to the On Scene Coordinator that the oleum tank be removed from its pedestals prior to neutralization. (U)

76. OH Materials personnel suggested to the On Scene Coordinator that the oleum tank be removed from the site to a remote location prior to neutralization of its contents. (U)

77. OH Materials personnel also suggested as another option that the oleum tank be placed on the ground at the rear of the Drake site prior to neutralization.

78. The On Site Coordinator rejected these recommendations. (U)

79. In considering OH Materials' suggestion that the tank be removed from the pedestals, the On Scene Coordinator considered the potential risks posed by an attempt to remove the tank.

80. The On Scene Coordinator considered factors such as the questionable stability of the tank and that no assurances could be given by OH Materials that the tank would not rupture or explode either during the removal process or during the attempt to relocate the tank.

81. Because of its location and the lack of specific information on the tank's age or previous use, it was difficult readily to determine the structural integrity of the tank or to gauge its stability on the pedestals.

82. The On Scene Coordinator ordered no investigation into the structural integrity of the oleum tank before rejecting OH Materials' recommendation of removing the tank from its pedestals prior to neutralization.

83. The risk of moving the tank by crane could have been minimized by placing the tank in a cradle while it was being lifted off its pedestals.

84. The oleum tank could then have been placed in a box on a truck designed to contain any oleum released from the tank during transportation.

85. The oleum tank could then have been placed at the rear of the site in a pre-dug ditch and rotated so that its manway (aperture) was facing in a generally horizontal position.

86. The tank could then have been covered with dirt, leaving the manway exposed, so as to minimize any movement of the tank during neutralization.

87. After assessing the risks and benefits of removing the tank from the pedestals, the On Scene Coordinator determined that it was safer to neutralize the tank on the pedestals. The following are some of the reasons why the On Scene Coordinator rejected OH Materials' recommendation of moving the tank:

(a) There was a possibility that the tank would rupture or explode during its removal and relocation on-site;

(b) the soil at the rear of the site, the area OH Materials suggested as the appropriate place for neutralizing the oleum tank, was unstable since it was believed to contain filled-in abandoned lagoons of chemicals;

(c) the area at the rear of the site was close to the American Chemical Plant;

(d) there was a possibility that the tank would rupture or explode during its relocation off-site and cause serious harm to the surrounding population and property.

88. On or before March 8, 1982, the On Scene Coordinator directed that the oleum be neutralized in place. (U)

89. Once the decision was made to neutralize the oleum tank on its pedestals, the On Scene Coordinator assigned OH Materials the task of recommending a procedure for the neutralization.

90. OH Materials recommended to the On Scene Coordinator that a proper procedure for neutralizing the tank was slowly to drain all of the liquid oleum from the tank through the bottom valve into a container of water. This process would allow the neutralization of the oleum in a controlled fashion. Following completion of the draining of the liquid oleum, the sludge could then be neutralized by slowly adding water to the tank and allowing it to react with the oleum-impregnated sludge. The tank could then be drained following the completion of the chemical reaction. This process would be repeated until all of the sludge was neutralized.

91. The On Scene Coordinator, Emergency Response Team personnel, Technical Response Team personnel, Department of Environmental Resources personnel, and OH Materials personnel discussed the neutralization procedures suggested by OH Materials.

92. The On Scene Coordinator approved the neutralization method suggested by OH Materials and authorized OH Materials to proceed with the neutralization.

93. On March 4, 1982, Jay E. Ort, a hydrogeologist employed by the Commonwealth of Pennsylvania, issued a report entitled "Recommendations on Meterological Controls at Drake Chemicals."

94. In that report, Mr. Ort recommended that the more hazardous operations at the Drake site, such as those involving the oleum, should be done with a north wind in excess of 3 knots on a bright sunny day.

95. EPA was in possession of Mr. Ort's report and recommendations prior to March 15, 1982.

96. EPA was on notice of the contents of Ort's report and recommendations prior to March 15, 1982.

97. The method employed in neutralizing the oleum initially involved draining all liquid oleum from the tank through a valve at the bottom of the tank. (U)

98. Then water was added to the tank, half a cup or less at a time. (U)

99. The free-flowing liquid was then allowed to drain out of the valve at the bottom of the tank. (U)

100. The free-flowing liquid was allowed to drain in a controlled quantity into a tank of water, producing neutralization of the oleum. (U)

101. A thimbleful of the oleum draining from the tank would react with the water in the tub below the tank with sufficient force so as to shake the tub and its contents weighing over 4,000 lbs.

102. On March 15, 1982, while this operation for oleum neutralization was being conducted, a packing nut on the valve through which the oleum was draining came loose. (U)

103. As a result of the loosening of the packing valve, an uncontrolled flow of oleum commenced from the valve into the water tub below.

104. Approximately one quart to one gallon of oleum dropped into the water tub below the oleum tank.

105. OH Materials personnel immediately tightened the valve, stopping the flow of oleum into the water. (U)

106. The oleum hitting the water tub produced a dense cloud of sulfur trioxide, sulfuric acid droplets, mist, and aerosol. (U)

107. The acid cloud migrated off-site. (U)

108. Five Pennsylvania Department of Transportation workers working on Second Avenue in Lock Haven were exposed to the acid cloud on March 15, 1982. (U)

109. The Pennsylvania Department of Transportation workers suffered respiratory distress.

110. Following the release of March 15, 1982, the On Scene Coordinator, OH Materials, and others discussed the cause of the release.

111. Following the acid release of March 15, 1982, OH Materials did not state any objections to the EPA regarding the continued neutralization of the oleum tank in the manner originally approved by the On Scene Coordinator.

112. It was concluded that the neutralization activities previously used should continue.

113. Following the acid release of March 15, 1982, the On Scene Coordinator instructed OH Materials to continue oleum neutralization in the manner originally approved by the On Scene Coordinator. (U)

114. In the regular course of the EPA's business on the Drake site, the On Scene Coordinator regularly prepared Pollution Reports documenting the situation, actions taken and future plans for the removal action. (U)

115. The Pollution Reports were prepared at or about the time of the events they record. (U)

116. Pollution Report No. 13, dated March 16, 1982, states: "If conditions are acceptable continue with work on Oleum tank No. 26." (U)

117. Pollution Report 14, dated March 17, 1982, states: "Work on Oleum tank # 26 if gas line has been repaired."

118. After March 15, 1982, OH Materials continued gradually to add water to the oleum tank. (U)

119. The product was then drained through the valve on the bottom of the tank. (U)

120. While the tank was being filled with water, firemen from the Lock Haven Fire Department directed fire hoses on the tank to cool the tank as the neutralization process was being performed. (U)

121. Personnel of the Department of Environmental Resources monitored air quality during the neutralization activities on the oleum tank.

122. When evidence of reaction between water and the contents (i.e. fuming) ceased, the tank was filled half-full of water. (U)

123. The tank was then allowed to stand for six hours, with no reaction being noted. (U)

124. The tank was then completely filled with water and allowed to stand overnight. (U)

125. The contents of the tank were then drained through the valve at the bottom of the tank. (U)

126. The valve at the bottom of the tank had become clogged with sludge on previous days.

127. The EPA was aware that the valve had become clogged with sludge on previous days.

128. On March 23, 1982, drainage ceased because of sludge blocking the valve at the bottom of the tank. (U)

129. To clear the sludge from the valve and allow drainage to continue, OH Materials personnel inserted rods through the manway at the top of the oleum tank. (U)

130. The rods were inserted with the knowledge of the EPA.

131. Following this insertion of rods through the manway, on March 23, 1982, at 3:57 P.M., a steam explosion occurred in the oleum tank. (U)

132. A large cloud of sulfer trioxide and sulfuric acid, in the form of droplets, mist and aerosol, vented out of the manway at the top of the tank. (U)

133. The release occurred over approximately a 15 second span. (U)

134. The release was punctuated by three distinct explosions. (U)

135. The cloud of sulfer trioxide and sulfuric acid rose approximately 40 to 50 feet into the air.

136. The oleum tank bounced approximately one inch off its pedestals several times during the course of the explosive release of March 23, 1982.

137. The oleum tank displayed no apparent damage from the explosion.

138. South-southwest winds were prevailing on March 23, 1982, blowing generally north-northeast. (U)

139. Blown by the wind, the acid cloud released from the oleum tank migrated off site into the City of Lock Haven.

140. The acid cloud of March 23, 1982, caused surface damage to over 500 motor vehicles, damaged an airplane, and damaged several buildings. (U)

141. On behalf of OH Materials, U.S.F. & G. paid claims totalling $133,296.27 arising out of the release of the acid cloud of March 23, 1982.

142. U.S.F. & G. hired Crawford and Company to adjust the claims arising out of damage caused by the acid cloud of March 23, 1982.

143. The hiring of Crawford and Company facilitated the prompt settlement of property damage claims arising out of the acid release incident of March 23, 1982.

144. On March 24, 1982, the On Scene Coordinator met with officials from the Department of Environmental Resources, and agreed that work prone to release of vapors would be done only on good dispersion days between 10:00 A.M. and 5:30 P.M. and on days when the wind was not blowing toward the City. (U)

145. Following the incident of March 23, 1982, the interior of the oleum tank was inspected through the use of mirrors and a camera. (U)

146. Visual inspection and photographic examination of the inside of the tank showed a residual crust line approximately halfway up the side of the tank. (U)

147. Based on the acid release of March 23, 1982 and the investigation conducted subsequent to the release, it can reasonably be concluded that the tank was roughly one-half full of 65% oleum. (U)

148. It is estimated that in the March 23, 1982 release incident, approximately 2,000 gallons of oleum reacted with 2,000 gallons of water to produce 4,000 gallons of 80% sulfuric acid. (U)

149. In the March 23, 1982 release incident, approximately 2,000 gallons of 80% sulfuric acid were vented through the manway of the tank.

150. Removing the oleum tank from the pedestals on which it sat and placing it on the ground at the rear of the site prior to neutralization would have had the following advantages over performing neutralization with the tank on its pedestals:

A. The contents of the tank could have been more accurately and easily measured;

B. The contents of the tank could have been removed manually more easily prior to neutralization;

C. Fire hoses could have been more effectively utilized to hose down any acid clouds released assuming that the firemen would utilize their hoses in the

event of an explosion of the magnitude involved in the March 23, 1982 incident;

D. Rotating the tank roughly 90 degrees along its longitudinal axis, as could have been done if the tank had been placed on the ground, would have diminished the amount of the sludge in the tank coming in contact with the water placed into the tank, thereby diminishing any reaction between water and sludge.

151. The risk to the surrounding population of the oleum neutralization operation would have been reduced by conducting the operation only in periods when north winds prevailed.

152. The United States EPA knew or should have known that the work of OH Materials at the Drake site involved a special danger to the public, inherent in the work, and was likely to create during its progress a peculiar risk of physical harm to the public unless special precautions were taken.

153. U.S.F. & G. timely filed a claim with the EPA, seeking administrative settlement in the amount of $152,291.25, pursuant to the provisions of the Federal Tort Claims Act, 28 U.S.C. §§ 1346(b) and 2671, *et seq.* (U)

154. That claim was rejected by decision dated March 21, 1984. (U)

155. At no time did U.S.F. & G. submit a claim to the EPA for a precise amount of damages regarding the personal injuries which occurred as a result of the acid cloud release of March 15, 1982.

### III. Discussion.

#### A. The Discretionary Function Exception.

■ The United States argues that the conduct of the EPA in cleaning the oleum tank was a discretionary function and, therefore, the United States cannot be held liable under the Federal Tort Claims Act, 28 U.S.C. § 2671, et seq., for any negligence which may have been involved in the cleanup of the Drake Site. We previously considered this argument in conjunction with a motion for summary judgment and by an opinion dated April 16, 1986 held that the discretionary function exception does not apply in this case. We refer the reader to that opinion for our analysis of the issue. After hearing the evidence, our view has not changed.

The decision by the United States to undertake to clean up the Drake site would fall within the discretionary function exception; however, this is not the decision which is being challenged in this case. The decision challenged involves the selection of the method used to remove the hazard posed by a tank containing oleum, a substance highly reactive to water. Perhaps the United States could have ignored the Drake site, but once it chose to clean up the hazardous wastes there, its decisions regarding the procedures to be followed were not of the nature and quality that Congress intended to shield from tort liability. *United States v. S.A. Empresa de Viacao Aerea Rio Grandense (Varig Airlines),* 467 U.S. 797, 104 S.Ct. 2755, 81 L.Ed.2d 660 (1984). The United States argues that it cannot be held liable for any incidents which occurred as a result of the initial decision to clean up the Drake site. The results of such a broad interpretation of the discretionary function exception could lead to results which Congress did not intend. The United States must be held accountable for the acts of its workers who carry out tasks on an operational level. The On Scene Coordinator's role in the cleanup operation was such that his conduct is not excluded from a claim brought pursuant to the Federal Tort Claims Act.

#### B. The Acid Cloud Release of March 15, 1982.

■ Five Pennsylvania Department of Transportation employees were injured as a result of the release of a cloud of sulphuric acid on March 15, 1982 during the neutralization of the tank containing oleum. U.S.F. & G. is subrogated to the personal injury claims of these workers and argues that the United States' negligence was the cause of the injuries. The United States asserts that this Court lacks jurisdiction over the personal injury claims

because U.S.F. & G. failed to file an administrative claim which complied with the Federal Tort Claims Act, 28 U.S.C. § 2675. This section provides that

(a) An action shall not be instituted upon a claim against the United States for money damages for ... personal injury ... caused by the negligent or wrongful act or omission of any employee of the Government ... unless the claimant shall have first presented the claim to the appropriate Federal agency...

(b) Action under this section shall not be instituted for any sum in excess of the amount of the claim presented to the federal agency, except where the increased amount is based upon newly discovered evidence not reasonably discoverable at the time of presenting the claim to the federal agency, or upon allegation and proof of intervening facts, relating to the amount of the claim.

28 U.S.C. § 2675.

The purpose of requiring tort claims to be filed first with the appropriate federal agency is to lessen the burden upon the federal courts by permitting the agencies to settle such claims pursuant to 28 U.S.C. § 2672. Title 28 of the Code of Federal Regulations at § 14.2(a) provides that

For purposes of the provisions of 28 U.S.C. § 2401(b) and 2672, a claim shall be deemed to have been presented when a Federal agency receives from a claimant ... an executed Standard Form 95 or other written notification of an incident, accompanied by a claim for money damages *in a sum certain* for injury to or loss of property, personal injury, or death alleged to have occurred by reason of the incident. (emphasis added)

It is undisputed that on or about June 14, 1982, U.S.F. & G. submitted a Standard Form 95 which claimed damages solely for the accident of March 23, 1982. By letter dated January 11, 1983, U.S.F. & G. first notified the United States of the five personal injury claims arising out of the March 15, 1982 accident. The specific sums for damages claimed by U.S.F. & G. in its correspondence with the United States did not include the $5,000 currently being claimed for these personal injuries. It is undisputed that at no time did U.S.F. & G. submit a claim to the EPA for a precise dollar amount of damages regarding the personal injuries. U.S.F. & G. did not comply with the requirements of 28 C.F.R. § 14.2 and 28 U.S.C. § 2675; therefore, this Court lacks jurisdiction over the personal injury claims. 28 U.S.C. § 2675(a); *Bialowas v. United States*, 443 F.2d 1047 (3d Cir.1971).

U.S.F. & G. argues that there is precedent for permitting it to present its personal injury claims in conjunction with the claims which have properly been pursued at the administrative level. We have reviewed the authorities cited by U.S.F. & G. and find that none support U.S.F. & G.'s argument. In the case of *Tucker v. United States Postal Service*, 676 F.2d 954 (3d Cir.1982) the Court of Appeals held that a Form 95 was sufficient for purposes of the Federal Tort Claims Act despite the fact that Plaintiff failed to forward itemized medical bills. The facts in *Tucker* are quite different from those in this case because in *Tucker* the Plaintiff included the amounts claimed for personal injury and property damage in her Form 95. As stated above, U.S.F. & G. has not submitted an administrative claim containing the amounts demanded for personal injuries arising out of the March 15, 1982 accident. U.S.F. & G. has failed to set forth facts sufficient to establish that there has been newly discovered evidence or intervening facts which entitle it to have the personal injury claims heard by this Court pursuant to 28 U.S.C. § 2675(b). We will enter an order dismissing without prejudice for lack of jurisdiction the personal injury claims asserted by U.S.F. & G.

**C. The Acid Cloud Release of March 23, 1982.**

U.S.F. & G. asserts that the United States is liable for the property damage which occurred as a result of the acid cloud release of March 23, 1982 based upon the theory of negligence. In order to maintain

an action in negligence, the Plaintiff must prove the existence of a legal duty flowing from the Defendant to the Plaintiff, a breach of that duty, and a causal connection between the breach and the injury. *Morena v. South Hills Health System*, 462 A.2d 680, 501 Pa. 634 (1983). The United States owed the public the duty of reasonable care under all the circumstances, and reasonable care where a hazardous activity is involved is a higher degree of care than would be required in the performance of ordinary activities. *Koelsch v. The Philadelphia Company*, 152 Pa. 355, 362, 25 A. 522 (1893), quoted in *Materna v. Pennsylvania Railroad Company*, 56 A.2d 233, 235, 358 Pa. 149, 153 (1948).

U.S.F. & G. argues that the United States breached its duty of care in three respects. First, U.S.F. & G. asserts that the United States was negligent in its failure to accept OH Materials' recommendation that the oleum tank be removed from its pedestals before neutralization was attempted. The relevant question is whether or not the EPA's decision to add water to the tank while it was on pedestals was reasonable based upon information known to the EPA at the time the decision was made. The EPA relied upon OH Materials' estimate that there were 110 gallons of oleum in the tank. We now know that there were approximately 2,000 gallons of oleum in the tank. OH Materials did not give OH Materials any reason to believe that its estimate of 110 gallons was incorrect. OH Materials is a company specializing in the cleanup and disposal of hazardous waste. In our view it was reasonable for the On Scene Coordinator to rely on OH Materials' estimate.

Based upon the estimate that the tank contained 110 gallons of oleum and faced with the options of neutralizing it either off site, at another location on site or on its pedestals, the On Scene Coordinator chose to neutralize the tank on its pedestals. The tank car was old and could have ruptured in transit, causing a more serious accident than the one which occurred. The presence of snow and ice on the site increased the risk of a serious hazard if the tank were to

rupture. The on site location to which OH Materials proposed to move the tank was in close proximity to another chemical plant and if a fire had commenced during the neutralization of the tank there was a risk that the other chemical plant could have been affected, thus causing greater chemical hazards to the public. It was unclear that the ground at the site OH Materials proposed to use was not weakened by the presence of abandoned chemical pits. For these reasons, the On Scene Coordinator's decision not to attempt to move the tank before neutralizing it was reasonable.

U.S.F. & G. has presented evidence that it would have been safer to perform the neutralization with the tank on its side at a location on the ground where bulldozers and fire hoses could have more easily contained any release that might have occurred. At this time there is more information than there was at the commencement of the cleanup of the Drake site in support of placing the tank on the ground before neutralization. For example, we now suspect that the tank could have withstood the stress of being moved by crane and truck because it withstood the force of the explosions of March 23, 1982. However, information now available to the EPA is not relevant to the reasonableness of the EPA's choice. This choice was reasonable, based upon information available at the time the choice was made.

Even if this Court had concluded that the On Scene Coordinator's choice of the method of neutralization was negligent, we would not find the EPA liable because U.S.F. & G. has failed to establish a causal connection between the decision not to move the tank and the accident which occurred. Negligent conduct is a cause of injury if it is a substantial factor in bringing about the injury. Restatement (Second) of Torts § 431; *Whitner v. Von Hintz*, 437 Pa. 448, 263 A.2d 889 (1970). Plaintiff need not show with absolute certainty that the negligence caused the injury. *Rosario v. American Export-Isbrandtsen Lines, Inc.*, 395 F.Supp. 1192, 1209–1210 (E.D.Pa.1975). The element of

causation would be met if Plaintiff showed a substantial possibility that the harm could have been avoided and that the negligence eliminated the possibility of avoiding the harm. *Id.* U.S.F. & G. has failed to show that there is a substantial possibility or even that it is more likely than not that there would have been no release of an acid cloud had the oleum tank been taken off the pedestals. One of U.S.F. & G.'s witnesses testified in answer to this Court's questions that releases during hazardous waste cleanups are common. The tank contained a large quantity of oleum sludge which created a very volatile situation. U.S.F. & G.'s expert witness, Samuel Insalaco, testified in response to this Court's questioning that he could not say that the tank would not have exploded had the tank been removed. Removing the oleum from the tank involved such great danger that it is entirely possible an accident of equal or greater seriousness might have occurred if the tank had been moved; therefore, the causal connection between acts asserted to be negligent and the occurrence of the accident has not been proved.

U.S.F. & G.'s second argument is that the United States was negligent in continuing after the March 15, 1982 accident to neutralize the oleum by adding water to the tank. It is unclear from the evidence why the same method of neutralization was used after the March 15 accident as was used before the accident. Nor did the evidence clarify whether once water had been added to the tank it was too late to commence the use of a different method of neutralization. There was no evidence that after the March 15, 1982 accident OH materials warned or advised the United States to try a different method of neutralization such as adding sulfuric acid or removing the tank from its pedestals. Based upon the evidence presented at trial, we cannot conclude that the United States was unreasonable in continuing to direct the neutralization of the tank in the same method used both before and after the March 15, 1982 accident.

U.S.F. & G.'s third argument is that the United States breached its duty of care by conducting the neutralization of the tank without regard to wind conditions. The area to the north, west and northeast of the Drake site was much more heavily populated than the area to the south, southeast and east of the site. It is undisputed that the wind was blowing in the direction of the City of Lock Haven on March 23, 1982. Had the wind been blowing in the opposite direction on that date much less property damage would have occurred. In conducting a cleanup of materials which could explode and release hazardous chemicals into the air, the entities responsible for the cleanup have the duty to take all reasonable precautions so as to protect public safety. One of the most basic of these precautions is to monitor the direction of the wind and to perform operations which could result in the release of hazardous materials into the air when the wind is blowing away from heavily populated areas. There was no expert testimony regarding whether it would be safe to perform such operations when there is no wind and we will not speculate on this point. It is conceivable that under certain circumstances the hazard posed by a tank would be so great that removal operations would have to proceed immediately and without regard to wind conditions, but this case did not present such a situation. There is no evidence that the neutralization operations would have been more dangerous had the addition of water, draining of the tank, unclogging of the valve, and other procedures involved in the neutralization been delayed so as to be performed on days with favorable wind conditions.

It could be argued that the parties did not have the duty to take wind into account in directing the neutralization of the oleum tank because at the commencement of the neutralization the quantity of oleum in the tank was inaccurately estimated to be 110 gallons. In our view, oleum is such a dangerous substance that 110 gallons of it should not have been neutralized without regard for the wind conditions.

■ The question arises whether the United States or OH Materials had the

responsibility for considering the wind conditions during neutralization. The parties do not dispute that OH Materials was acting as an independent contractor. The United States cannot be held liable under the Federal Tort Claims Act for the negligence of its independent contractors. 28 U.S.C. § 1346(b), § 2671; *United States v. Orleans*, 425 U.S. 807, 813–814, 96 S.Ct. 1971, 1975–1976, 48 L.Ed.2d 390 (1976); *Logue v. United States*, 412 U.S. 521, 527, 93 S.Ct. 2215, 2219, 37 L.Ed.2d 121 (1973). Nor can the United States be held liable under the Federal Tort Claims Act on principles of strict liability for damage arising out of the performance of ultrahazardous activities. *Laird v. Nelms*, 406 U.S. 797, 801, 92 S.Ct. 1899, 1902, 32 L.Ed.2d 499 (1972). Thus, OH Materials must prove negligence on the part of the United States in order to recover.

The Comprehensive Environmental Response, Compensation, and Liability Act of 1980, 42 U.S.C. § 9601, et seq. ("The Act") assigns to the President who has delegated to the EPA responsibility for conducting cleanup operations such as the one performed at the Drake Site. The EPA has the power to delegate certain tasks to independent contractors; however, in this case the EPA retained ultimate authority to select the cleanup methods and supervise the cleanup operations. The EPA retained a certain amount of control over the safety procedures to be followed during the cleanup as evidenced by the fact that OH Materials was not entirely free to do the work in any manner it chose. *DiSalvatore v. United States*, 456 F.Supp. 1079 (E.D.Pa.1978).

> One who entrusts work to an independent contractor, but who retains the control of any part of the work, is subject to liability for physical harm to others for whose safety the employer owes a duty to exercise reasonable care, which is caused by his failure to exercise his control with reasonable care.

Restatement (Second) of Torts § 414. The EPA knew of a report prepared by J.E. Ort, a hydrogeologist employed by the Commonwealth of Pennsylvania in which Mr. Ort recommended that the more hazardous operations at the Drake site, such as those involving the oleum, be performed with a north wind in excess of 3 knots on a bright sunny day. Even if the EPA had not been aware of this report, it should have been aware of the importance of paying attention to wind conditions. The EPA knew that neutralization of the oleum tank involved a special danger to the public and should have done everything within its power to minimize the risk of harm to the public by taking precautions such as instructing OH Materials to perform hazardous operations on days with favorable wind conditions and checking to see that OH Materials followed such instructions. The EPA did not direct OH Materials to pay attention to wind conditions nor did the EPA take the necessary precautions itself until after the accident of March 23, 1982. On March 24, 1982, the EPA decided that work prone to release of vapors would be done only on days when the wind was not blowing toward the city. This decision should have been made before neutralization of the oleum tank began. Clearly, the EPA breached its duty of care before March 24, 1982 in permitting neutralization to proceed without regard to wind conditions.

■ We next address the question of OH Materials' responsibility for considering the wind conditions during neutralization. The contract between the EPA and OH Materials provides that OH Materials shall furnish the "... necessary personnel, materials, services, facilities, and otherwise do all things necessary for or incident to the performance of the work" described in the document entitled "Scope of Work." Plaintiff's Exhibit P-2. It appears to this Court that there is no reference in the Scope of Work to the oleum tank; however, included in the Scope of Work is the following sentence: "The contractor shall be responsible for the staging and preparation for disposal of all waste containing drums on site, as determined by the OSC or his designee." It is possible that the parties intended the term "drum" to include the oleum tank. Despite the apparent vagueness of the con-

tract, OH Materials and the EPA viewed the cleanup of the oleum tank as within the scope of work to be performed by OH Materials. It could be said that the parties orally and through their conduct modified the contract so as to provide that OH Materials be responsible for cleaning the tank. *Barnhart v. Dollar Rent A Car Systems, Inc.*, 595 F.2d 914 (3d Cir.1979); *Appalachian Power Co. v. Federal Power Commission*, 529 F.2d 342, 350 (D.C.Cir.1976), *cert. denied*, 429 U.S. 816, 97 S.Ct. 58, 50 L.Ed.2d 76. Given that OH Materials was responsible under the contract for cleaning the oleum tank we return to the language at page one of the contract which states that OH Materials "... shall furnish the necessary ... services ... and otherwise do all things necessary for or incident to the performance of the work..." Plaintiff's Exhibit P–2. In our view, considering wind conditions was a necessary aspect of performing the cleanup of the oleum tank. OH Materials was responsible for devising the plan for neutralization of the oleum tank and although OH Materials did not have the power to make final determination of the neutralization method used, it did have a duty properly and safely to perform the operations which it undertook. OH Materials should have checked the wind direction and accordingly timed procedures such as inserting rods into the tank, adding water to the tank, and taking other steps which increased the risk that dangerous substances would be released so that these procedures would not take place when the wind was blowing toward Lock Haven. The decisions regarding the day to day operations at the oleum tank were reached during meetings between officials of the EPA and of OH Materials. There was no evidence that OH Materials ever advised the EPA that either OH Materials or the EPA should refrain from performing the most hazardous operations when the wind was blowing in the direction of Lock Haven. OH Materials breached its duty of care before March 24, 1982 in conducting neutralization of the oleum tank without regard to wind conditions.

█ U.S.F. & G. argues that the United States should be held liable for actions of OH Materials under principles set forth in sections 413, 416, 427 and 427A of the Restatement (Second) of Torts. These sections contain exceptions to the general rule that an employer is not liable for the negligence of its independent contractor. We are not persuaded by U.S.F. & G.'s attempt to distinguish the principles described in sections 413, 416, 427 and 427A of the Restatement from strict liability or vicarious liability. The doctrine which U.S.F. & G. wishes us to apply essentially states that an employer is liable for the negligence of the independent contractor irrespective of whether the employer has been at fault. *Gibson v. United States*, 567 F.2d 1237, 1244 (3d Cir.1977). The Court of Appeals has rejected sections 416 and 427 of the Restatement (Second) of Torts as a basis for recovery under the Federal Tort Claims Act. *Id.* Whether this doctrine is labelled strict liability or vicarious liability, it is not properly a basis for recovery against the United States under the Federal Tort Claims Act. *Gibson v. United States*, 567 F.2d 1237 (3d Cir.1977); *Laird v. Nelms*, 406 U.S. 797, 92 S.Ct. 1899, 32 L.Ed.2d 499 (1972).

It could be argued that OH Materials' erroneous estimate of the quantity of oleum in the tank and not the parties' inattention to wind was the cause of the damage. It does not appear from the evidence that any more attention would have been paid toward wind conditions had the parties known that the tank contained 2,000 gallons of oleum instead of 110 gallons. The fact that the neutralization of of the tank proceeded on March 23, 1982 while the wind was blowing toward Lock Haven was a substantial factor in bringing about the property damage which occurred.

█ Having concluded that both the EPA and OH Materials were negligent in failing to take wind into account with regard to the neutralization of the oleum tank and that their combined negligence was a substantial factor in bringing about the damage, we address the question of

their respective causal negligence. OH Materials was an expert in cleaning up hazardous waste, knew or should have known of the importance of paying attention to wind conditions and should at least have raised this point with the EPA. However, OH Materials did not have the power to make final decisions regarding the cleanup operations. The EPA's negligence was a greater cause of the damages than that of OH Materials because the EPA retained the ultimate power to make decisions regarding the cleanup operations. In our view, 40% of the causal negligence is attributable to OH Materials and 60% of the causal negligence is attributable to the EPA for the property damage which occurred as a result of the accident of March 23, 1982 during the cleanup of the oleum tank.

 U.S.F. & G. argues that it is entitled to indemnity or contribution from the United States. In support of its request for indemnity, U.S.F. & G. cites section 886B of the Restatement (Second) of Torts which provides:

> Indemnity between tortfeasors.
>
> (1) If two persons are liable in tort to a third person for the same harm and one of them discharges the liability of both, he is entitled to indemnity from the other if the other would be unjustly enriched at his expense by the discharge of the liability. . . .

The comments regarding the history of section 886B of the Restatement provide that "A suit for indemnity is brought to recover the total amount of the payment by the plaintiff, on the ground that the plaintiff's conduct was not as blameworthy as the defendant's. . . ." Restatement (Second) of Torts, § 886B, Comments. U.S.F. & G. argues that indemnity is appropriate because the United States is strictly liable or because OH Materials acted in obedience to the directions of the United States. We have held that strict liability cannot form the basis for recovery under the Federal Tort Claims Act. *Laird v. Nelms*, 406 U.S. 797, 92 S.Ct. 1899, 32 L.Ed.2d 499 (1972). Further, OH Materials had its own duty to

consider wind conditions. Both OH Materials and the United States were negligent and should share the cost of the damages; therefore, the proper means for OH Materials to recover is through contribution.

The United States argues that contribution is not available to U.S.F. & G. because the United States is secondarily liable and OH Materials is primarily liable for the damages caused by the March 23, 1982 accident. The United States cites the case of *Burbage v. Boiler Engineering & Supply Co., Inc.*, 249 A.2d 563, 433 Pa. 319, 326–327 (1969) as authority for this proposition. The distinction between primary and secondary liability is not based on a difference in degree of negligence or upon comparative negligence; rather, it is based on a difference in the character of the wrongs and the duty owed by each of the tort-feasors. *Id.*

> Secondary as distinguished from primary liability rests upon a fault that is imputed or constructive only, being based on some legal obligation between the parties or arising from some positive rule of statutory or common law or because of a failure to discover or correct a defect or remedy a dangerous condition caused by the act of the one primarily responsible.

*Id.* at 327. Both OH Materials and the EPA had the duty to consider wind direction in performing the cleanup. The EPA had the duty to make sure the independent contractor followed all necessary safety precautions and OH Materials had the duty to raise the issue of wind direction with the EPA. The EPA's duty regarding safety was not reduced by the fact that OH Materials also had a duty to take all necessary precautions. In our view, the doctrine of primary and secondary liability does not apply to the facts of this case.

In order for the Pennsylvania Uniform Contribution Among Tortfeasors Act, 42 Pa.C.S.A. § 8321, et seq. ("the Act") to apply to this case, OH Materials and the United States must be joint tort-feasors. Joint tort-feasors are defined as "... two or more persons jointly or severally liable in tort for the same injury to persons or

property, whether or not judgment has been recovered against all or some of them." 42 Pa.C.S.A. § 8322. In order to determine whether parties are joint tort-feasors, courts consider factors such as the identity of a cause of action, the existence of a common or like duty, whether the same evidence will support an action against each party, the nature of the injury, identity of facts as to time, place, or result, and whether the injury is direct and immediate rather than consequential. *Harka v. Nabati*, 487 A.2d 432, 337 Pa.Super. 617 (1985). Both OH Materials and the United States had a duty to consider wind conditions during neutralization. Both parties had the opportunity to guard against the other's negligence. The same evidence would support an action against each party and the injury caused by the negligence of OH Materials and of the United States is the same. Therefore, OH Materials and the United States are joint tort-feasors within the definition of the Act.

Under the Pennsylvania Uniform Contribution Among Tortfeasors Act, the non-released party is entitled to have the claim against it reduced in accordance with payments made pursuant to a release in favor of a joint tort-feasor. 42 Pa.C.S.A. § 8326; *Sochanski v. Sears, Roebuck & Co.*, 689 F.2d 45, 48 (3d Cir.1982). If the released party pays more than its pro rata share, the non-released party is entitled to have the claim reduced by the total amount of consideration paid under the release. *Id.* Thus, the United States is entitled to have a claim against it reduced in accordance with the terms of the release given to U.S.F. & G. by those whose property was damaged by the acid cloud. Because the United States's liability has been extinguished by this release, U.S.F. & G. has a right of contribution from the United States for the amount U.S.F. & G. paid in excess of its own share of liability. 42 Pa.C.S.A. § 8324.

It is possible that counsel have stipulated or will stipulate to the amount of damages to be assessed in this case. Therefore, we will provide counsel the opportunity to file such a stipulation and a proposed order. If counsel are unable to reach a stipulation regarding damages, we will schedule a hearing regarding the damages phase of this case.

IV. Conclusions of Law.

1. The United States had a duty to maintain the highest degree of care, utilizing every reasonable precaution suggested by experience and the known danger, including taking into account wind conditions, in making decisions concerning the methods employed in neutralizing the tank containing oleum.

2. OH Materials had a duty to maintain the highest degree of care, utilizing every reasonable precaution suggested by experience, and the known danger, including taking into account wind conditions, in performing the neutralization of the tank containing oleum.

3. The United States breached its duty of care in failing to take wind conditions into account while supervising the neutralization of the oleum tank.

4. OH Materials breached its duty of care in failing to take wind conditions into account in performing the neutralization of the oleum tank.

5. The United States's breach of its duty of care regarding wind conditions was a substantial factor in bringing about the property damage which occurred on March 23, 1982.

6. OH Materials' breach of its duty of care regarding wind conditions was a substantial factor in bringing about the property damage which occurred on March 23, 1982.

7. 60% of the causal negligence regarding the property damage which occurred on March 23, 1982 is attributable to the United States.

8. 40% of the causal negligence regarding the property damage which occurred on March 23, 1982 is attributable to U.S.F. & G.

9. Pursuant to its policy insuring OH Materials, U.S.F. & G. is subrogated to all claims of OH Materials against the United

States arising out of U.S.F. & G.'s payments to the claimants suffering property damage as a result of the acid cloud release of March 23, 1982.

10. U.S.F. & G.'s payments to persons suffering property damage as a result of the acid cloud release on March 23, 1982 had the effect of protecting the United States from claims of these persons.

11. U.S.F. & G. is entitled to 60% contribution from the United States for all damages and reasonable expenses including the adjustor's expense paid as a result of the chemical release of March 23, 1982 pursuant to principles of comparative negligence.

An appropriate order will be entered.